WATERMAN, Justice.
In this appeal, we must address the immunity from civil liability afforded by Iowa Code section 232.73 (2009) for a physician participating in a child abuse assessment. The physician treated the infant victim’s broken arm and told the investigator for the Iowa Department of Human Services (DHS) the father’s version of how the injury occurred was plausible. The baby was left in his parents’ care and three weeks later suffered a severe brain injury while with his father.
The infant’s adoptive parents filed this medical malpractice action, alleging the physician’s negligence and reckless or willful conduct was a proximate cause of the baby’s subsequent injuries because the DHS relied on his assessment to initially decide to leave the baby with the baby’s father. The defendants moved for summary judgment, asserting the physician participated in the DHS assessment in good faith and therefore is immune from liability under section 232.73. The district court ruled that questions of fact precluded summary judgment, and we allowed the defendants’ interlocutory appeal.
For the reasons explained below, we hold the defendants are entitled to good-faith immunity under section 232.73. Undisputed facts establish the physician participated in good faith in the DHS assessment. We therefore reverse the order denying summary judgment and remand the case for the entry of summary judgment in favor of the defendants.
I. Background Facts and Proceedings.
The parents of E.N., a three-week-old infant, brought him to the emergency room at Mercy Medical Center with a broken arm on June 18, 2009. His father, Jonas Neiderbach, claimed that he heard a snap as he set his baby down with his arm behind him. Dr. Scott Barron, a pediatric emergency room physician, did not believe *4 the father’s story.' Dr. Barron believed the spiral fracture could not have been caused by E.N.’s body weight, especially because the baby’s bones were pliable. Dr. Barron reported his concerns to the DHS, which began a child-abuse investigation under Iowa Code section 232.70. DHS caseworker Darla Brown came to the hospital, spoke with Dr. Barron and E.N.’s parents, and reviewed E.N.’s medical records. Meanwhile, Dr. Barron referred E.N. to Dr. Selover, who agreed the injury was consistent with abuse. Dr. Selover questioned the father’s story because at E.N.’s age infants typically extend their arms forward rather than backwards. Dr. Selover contacted Dr. Lindaman for assistance in treáting the fracture. Dr. Linda-man lacked significant experience evaluating claims of child abuse in infants, but as a pediatric orthopedic surgeon was well qualified to treat the fracture.
On June 19, Dr. Lindaman saw E.N. and successfully immobilized the arm. Dr. Lindaman noted in his treatment plan, “At this time the injury does fit with the mechanism described. I don’t see any signs of any other skeletal trauma.” Meanwhile, Brown had already told the Polk County Attorney she would probably be requesting a no-contact order-against the father. Brown phoned Dr. Lindaman to continue gathering information for her assessment. Her notes of their conversation state:
This worker spoke[ ] with Dr. Linda-man .... Dr. Lindaman indicated that if the father was holding baby by the chest and laying him down on the bed, placing him down with one side of his body coming into contact with the bed first, that it was plausible that the arm on that side of the body could get pinned under his body behind him.
This worker questioned whether a 'child, weighing only 8 lbs. 11 oz., would have enough force.to create this injury. I also provided information that dad had provided a different explanation with how he laid [E.N.] down, with one hand under its head and the other under its butt. I also questioned whether a crying child’s arm would go back behind him as he would more likely to be pulling his arms tight in front of him. Through this line of questioning, he stated on several occasions, “the mechanism they described fits the fracture seen.”
Dr. Lindaman also indicated that he did not see any' other injuries. He also stated that the family appeared appropriate and they brought [E.N.] in immediately. Dr. Lindaman stated that he saw no evidence to indicate healing of the fracture, which would indicate it was consistent with the time frame provided by parents. All these factors lead to his assessment of the injury.
Following her conversation with Dr. Lindaman, Brown decided not to seek a no-eontact order and allowed E.N. to go home with a family safety plan in place. E.N.’s parents and paternal grandfather, with whom E.N. lived, agreed that E.N.’s father would not be left alone with E.N. Due to her continuing concerns and what she saw as conflicting medical opinions, Brown spoke with her supervisor and scheduled a multidisciplinary team meeting for June 30 to discuss E.N.’s case.
On June 26, Dr. Lindaman conducted a follow-up visit with E.N. at his office. Dr. Lindaman performed a physical examination while E.N. remained in his mother’s arms. The arm bone was in good alignment and x-rays taken that day showed good early healing. Dr. Lindaman focused on the healing arm bone fracture without examining E.N. for signs of any other injuries. It is unknown whether a full body examination that day would have detected the rib fractures that were discovered twelve days later.
*5 The multidisciplinary team meeting on June 30 involved representatives of the Polk County Attorney’s Office, the DHS, Des Moines police, and medical professionals. Every medical professional present agreed that E.N.’s injuries could not have occurred as the father described them. Dr. Oral reviewed the radiographs with two additional colleagues including another pediatric orthopedic specialist to confirm that the story the father told was inconsistent with the type of injury. After receiving an email from Dr. Oral, Brown prepared the paperwork requesting a no-contact order for E.N.’s father on July 6. Meanwhile, Dr. McAuliff explained the reasons for the multidisciplinary team’s conclusions to Dr. Lindaman, including the fact that infant flexor tone at one month does not allow an infant’s arms to easily fall behind its body. After that discussion, Dr. Lindaman did not change his original opinion regarding biomechanics, but acknowledged the flexor tone information made the father’s story very unlikely.
The court entered the no-contact order on Wednesday, July 8. Normally, such orders are served immediately. However, the DHS decided to serve the no-contact order on Friday, July 10 when the family returned from a nearby camping trip. In fact, the family was not camping. E.N.’s grandfather (a DHS employee) took E.N. to DHS headquarters the afternoon of July 8 to meet his coworkers, and E.N. appeared to be in good health at that time. The DHS did not attempt to serve the order that afternoon. On the evening of July 8, E.N. was admitted to the hospital with massive brain injuries. E.N. also had seventeen rib fractures, some fresh and some older.
E.N.’s mother and father were charged with child endangerment. The mother pled guilty and was sentenced to twenty years in prison. The father was found guilty by a Polk County jury and sentenced to fifty years in prison. See State v. Neiderbach, 837 N.W.2d 180, 189 (Iowa 2013).
In an affidavit executed January 10, 2013, Dr. Lindaman described his involvement with E.N. and the DHS. He described his impression of being called in for a limited consultation regarding the treatment of a fracture. He states that he was aware other physicians were already evaluating child abuse issues, and therefore he
made no effort to make my own evaluation of the credibility of the father with regard to the medical history.... The only opinion I developed was that ... the history could possibly be consistent with the type of spiral humeral fracture I observed in this child.
Dr. Lindaman also described his phone call with Brovm as follows:
As the DHS investigator’s notes of the call they had with me indicate, I refused to give them any opinion regarding the credibility of the father’s story or regarding child abuse, even though they raised with me some issues that they thought undercut his credibility. The reason I refused to give them any opinion regarding credibility and child abuse is because I had not performed an investigation regarding child abuse. Therefore, each time the DHS raised an issue concerning that, I repeated the only opinion I could help them with for their assessment; namely, my opinion that, as a matter of biomechanics, the mechanism that the parents had described to me fit the fracture seen, by which I meant that the father’s story about the arm being pinned and twisted behind the child’s back, if true, could be consistent with a spiral humeral fracture occurring in that arm.
*6 E.N. was subsequently adopted by Shannon and Danny Nelson. On June 10, 2011, they filed this action individually and on behalf of E.N. They alleged Dr. Linda-man negligently failed to detect and report the child abuse and that Mercy Medical Center — Des Moines was vicariously liable for Dr. Lindaman’s negligence.[1] The Nelsons further alleged Dr. Lindaman’s conduct was “reckless and/or willful” and sought punitive damages against him and Mercy. The Nelsons never alleged Dr. Lindaman believed the statements he made to DHS were untrue. The Nelsons do not claim Dr. Lindaman mistreated the arm fracture itself.
Defendants moved for summary judgment on several grounds: the immunity under Iowa Code section 232.73 and the lack of evidence to prove causation or the willful and wanton misconduct required for punitive damages. The Nelsons resisted and submitted expert medical testimony that Dr. Lindaman breached the standard of care. The Nelsons also argued defendants waived the immunity defense by failing to plead it. Defendants filed motions to amend their answers to plead immunity, and the district court allowed the amendments.[2] On April 1, 2013, the court denied the summary judgment motions, stating:
Based upon the record made the court concludes that the summary judgment motions should be denied. There are genuine issues of material fact as to whether the defendant doctor rendered an opinion or not for DHS, whether reliance on that opinion caused injury to the child, whether the doctor’s communications to DHS were in good faith or not, whether the doctor’s conduct provides immunity and whether the communication with DHS was actually aiding or assisting in a child abuse assessment.
We granted defendants’ application for interlocutory appeal and retained the appeal.
II. Standard of Review.
“We review a district court decision granting or denying a motion for summary judgment for correction of errors at law.” Wallace v. Des Moines Indep. Cmty. Sch. Dist. Bd. of Dirs., 754 N.W.2d 854, 857 (Iowa 2008). “A matter may be resolved on summary judgment if the record reveals only a conflict concerning the legal consequences of undisputed facts.” Id.; see also Garvis v. Scholten, 492 N.W.2d 402, 403 (Iowa 1992) (same). Summary judgment is appropriate when “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Iowa R. Civ. P. 1.981(3). “The moving party has the burden of showing the nonexistence of a material fact.” Hlubek v. Pelecky, 701 N.W.2d 93, 95 (Iowa 2005). “An issue of fact is ‘material’ only when the dispute involves facts which might affect the outcome of the suit, given the applicable governing law.” Wallace, 754 N.W.2d at 857. An issue is “genuine” if the evidence in the record “is such that a reasonable jury could return a verdict for the non-moving party.” Id. We view the evidence in the light most favorable to the nonmoving party, who is entitled to every legitimate inference that we may draw *7 from the record. Id. “Speculation is not sufficient to generate a genuine issue of fact.” Hlubek, 701 N.W.2d at 96.
III. Analysis.
We must decide whether the district court erred by denying defendants’ motion for summary judgment based on the statutory immunity in Iowa Code section 232.73. We will discuss the scope of immunity under that statute and then address whether the defendants were entitled to summary judgment on the record in this case.
We begin with the text of section 232.73, which in relevant part provides:
A person participating in good faith in the making of a report, photographs, or X rays, or in the performance of a medically relevant test pursuant to this chapter, or aiding and assisting in an assessment of a child abuse report pursuant to section 232.71B, shall have immunity from any liability, civil or criminal, which might otherwise be incurred or imposed. The person shall have the same immunity with respect to participation in good faith in any judicial proceeding resulting from the report or relating to the subject matter of the report.
Iowa Code § 232.73(1).
Section 232.73 provides a form of qualified immunity. See Hlubek, 701 N.W.2d at 96 (noting statutes immunizing conduct performed in good faith provide qualified, not absolute, immunity). “Qualified immunity is a question of law for the court and the issue may be decided by summary judgment.” Dickerson v. Mertz, 547 N.W.2d 208, 215 (Iowa 1996); see also Garvis, 492 N.W.2d at 404 (affirming summary judgment based on section 232.73 immunity); Maples v. Siddiqui, 450 N.W.2d 529, 531 (Iowa 1990) (same). Summary judgment is an important procedure in statutory immunity cases because a key purpose of the immunity is to avoid costly litigation, and that legislative goal is thwarted when claims subject to immunity proceed to’trial. See Plumhoff v. Rickard, — U.S.-, —, 134 S.Ct. 2012, 2019, 188 L.Ed.2d 1056, 1064 (2014) (“[T]his [immunity] question could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost.”); Hlubek, 701 N.W.2d at 98 (noting statutory immunity removes the “ ‘fear of being sued’ ” and affirming summary judgment (quoting Harlow v. Fitzgerald, 457 U.S. 800, 814; 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396, 408 (1982))). Indeed, in Hlubek, we recognized the defendants’ observation that “statutory immunity, like common-law immunity, provides more than protection from liability; it provides protection from even having to go to trial in some circumstances.” 701 N.W.2d at 96. Qualified immunity is “an entitlement not to stand trial or face the other burdens of litigation.” Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411, 425 (1985).
In Garvis, we specifically noted the purpose of immunity under section 232.73 is to remove “the fear of litigation” for those assisting child abuse investigations. 492 N.W.2d at 404; see also Ellen Wright Clayton, To Protect Children from Abuse and Neglect, Protect Physician Reporters, 1 Hous. J. Health L. & Pol’y 133, 146 (2001) (calling for absolute immunity for physicians reporting child abuse or assisting investigations into suspected child abuse because “[r]elieving the fear of litigation will promote appropriate reporting”). Defendants argue that to allow the claims in this case to proceed to trial would have a chilling effect on the willingness of the medical community to communicate with child abuse investigators. We share *8 that concern and apply the immunity statute as written to effectuate its purpose.
A. The Scope of Immunity Under Iowa Code Section 232.73. Section 232.73 applies in medical malpractice actions brought against private physicians who provide information to child abuse investigators. Maples, 450 N.W.2d at 530-31. The purpose of the statute is “to encourage those who suspect child abuse to freely report it to authorities without fear of reprisal if their factual information proves to be faulty.” Id. at 530. “An additional purpose is to encourage those having information about child , abuse to come forward when asked to do so, without the fear of litigation should it later be shown that the information was improperly released.” Garvis, 492 N.W.2d at 404. These legislative purposes, in our view, apply equally to both physicians who initiate reports to the DHS, and to those, such as Dr. Lindaman, who respond to inquiries from child abuse investigators. The statute applies the same good-faith immunity to both those who report suspected abuse and those who assist in investigations initiated by others.
“Good faith” under section 232.73 is determined under a subjective standard. Id. “Reasonableness and the objective (reasonable person) standard are the hallmarks of negligence. Because immunity under section 232.73 extends to negligent acts, reasonableness and the objective standard play no part in determining good faith.” Id. Therefore, good faith “rests on a defendant’s subjective honest belief that the defendant is aiding and assisting in the investigation of a child abuse report.” Id. We further observed:
“As good faith means only honesty in fact, negligence ordinarily has no significance. That is, the honesty in fact that constitutes good faith merely requires honesty of intent and it is not necessary to show that the person was diligent or non-negligent. Bad faith, then, is obviously something far more extreme than a failure to observe reasonable ... standards or the standards of a reasonably prudent [person]. It is irrelevant that the person in question was negligent in forming a particular belief. All that is required ... is the actual belief or satisfaction of the criterion of ‘the pure heart and empty head.’ ”
Id. (quoting Jackson v. State Bank of Wapello, 488 N.W.2d 151, 156 (Iowa 1992)). Thus, persons aiding or assisting in a child abuse investigation are entitled to immunity under section 232.73 if they act in good faith as we described in Garvis. To avoid summary judgment, the plaintiff must have evidence the defendant acted dishonestly, not merely carelessly, in assisting the DHS. Id.
We are mindful of the legislative directive that chapter 232 “shall be liberally construed to the end that each child under the jurisdiction of the court shall receive ... the care, guidance and control that will best serve the child’s welfare.” Iowa Code § 232.1. The legislature elaborated on the purpose of the child abuse reporting provisions:
Children in this state are in urgent need of protection from abuse. It is the purpose and policy of this part 2 of division III to provide the greatest possible protection to victims or potential victims of abuse through encouraging the increased reporting of suspected cases of abuse, ensuring the thorough and prompt assessment of these reports, and providing rehabilitative services, where appropriate and whenever possible to abused children and their families which will stabilize the home environment so that the family can remain intact without further danger to the child.
*9 Id. § 232.67 (emphasis added). We have observed that “the forceful language of the statute articulates a well-recognized and defined public policy of Iowa.” Teachout v. Forest City Cmty. Sch. Dist., 584 N.W.2d 296, 301 (Iowa 1998). We therefore construe the immunity provision in section 232.73 liberally to encourage communications between physicians and DHS child abuse investigators. This is consistent with our general approach to construe statutory immunity provisions broadly. See Cubit v. Mahaska County, 677 N.W.2d 777, 784 (Iowa 2004) (surveying cases construing Iowa statutory immunity provisions broadly and exceptions to immunity narrowly).
In Maples, parents brought their four-month-old child to a hospital where Dr. Siddiqui diagnosed the baby with failure to thrive that she attributed to poor parenting skills. 450 N.W.2d at 529. The child was placed in temporary foster care, but further studies determined that malab-sorption syndrome was responsible for his. failure to gain weight. Id at 530. After the child was returned to his parents, they sued Dr. Siddiqui for their loss of companionship and society while the child was in foster care. Id. Dr. Siddiqui moved for summary judgment based on section 232.73 immunity. Id. The district court granted summary judgment, and we affirmed. Id. at 530-31.
The case turned on the communication Dr. Siddiqui made to the juvenile authorities. Id. at 530. That communication caused the child’s removal from the home. Id. The parents argued that the doctor’s negligence in diagnosing his condition negated the good-faith element of section 232.73. Id. We disagreed because the parents’ interpretation “would thwart the apparent purpose of section 232.73, which is to encourage those who suspect child abuse to freely report it to the authorities without fear of reprisal.” Id. Indeed, we noted that no statutory immunity would be needed unless liability would otherwise exist for a negligent act or breach of duty. Id. We observed that our interpretation “accords with the decisions of courts in other jurisdictions.” Id. at 531.
In Garvis, we elaborated on the good faith required to establish immunity. 492 N.W.2d at 404. Laurene Garvis attended counseling sessions with Dr. Scholten, during which she discussed her relationship with her children. Id. at 403. An investigator for the DHS called Dr. Scholten, identified herself as a protective services investigator, and requested information from the counseling sessions. Id. Dr. Scholten provided that information, and the child abuse report ultimately proved founded. Id. Laurene brought suit for compensatory and punitive damages for disclosure of confidential medical information. Id. The parties disagreed whether a subjective or objective standard of good faith should be used to establish immunity under section 232.73. Id. at 403-04. We adopted the subjective standard. Id. at 404. This followed from Maples because we had already decided in that case that the immunity covered negligent acts. Id. We affirmed summary judgment dismissing the claims for both compensatory and punitive damages. Id.
These cases make clear that a physician responding in good faith to inquiries from a child abuse investigator is entitled to immunity from claims alleging not only negligence, but the willful, wanton, or reckless conduct required for punitive damages. See id. at 403-04. The legislature, when it chooses, knows how to limit immunity provisions to simple negligence claims because in other immunity statutes it has carved out exceptions to *10 allow claims alleging gross negligence or other heightened misconduct to proceed.[3] By contrast, section 232.73 expressly provides immunity from “any liability, civil or criminal, which might otherwise be incurred or imposed.” (Emphasis added.) “This court has no power to read a limitation into the statute that is not supported by the words chosen by the general assembly.” Cubit, 677 N.W.2d at 782. If the legislature wanted to exclude from section 232.73 claims alleging reckless or willful misconduct, it would have said so, as it has in other statutes providing immunity for persons acting in good faith.[4]
B. The Record Supporting Summary Judgment on Immunity. Against this backdrop, we turn to the evi-dentiary record to determine if defendants were entitled to summary judgment under section 232.73 (2009). The issue is not whether Dr. Lindaman was negligent or even reckless in failing to detect child abuse. Rather, the question is whether he “participat[ed] in good faith ... in ... aiding and assisting in an assessment of a child abuse report” within the meaning of section 232.73. We conclude that undisputed facts establish his immunity defense as a matter of law.
*11 Dr. Lindaman was one of E.N.’s treating physicians. It is undisputed the DHS investigator, Brown, elicited Dr. Lindaman’s input to help determine whether the baby’s fracture resulted from child abuse. Dr. Lindaman responded to the DHS inquiries. He gave his opinion to Brown that the father’s version of how the baby’s arm was injured was “plausible.” As he put it to Brown, the “mechanism described fits the injury seen.” That is, he communicated to the DHS that the spiral fracture suffered by E.N. could have happened the way the father described. Other doctors disagreed. But, again, the issue is not whether Dr. Lindaman was wrong, reckless, or negligent in forming or communicating his opinion to the DHS. Rather, the question for summary judgment is whether he acted in good faith in participating in the DHS investigation. To avoid summary judgment, the Nelsons needed evidence generating a genuine issue of material fact that Dr. Lindaman acted dishonestly in communicating with Brown. See Garvis, 492 N.W.2d at 404; see also Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir.2005) (“Summary judgment is not a dress rehearsal or practice run, it is the put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events.” (Internal quotation marks omitted.)); Green v. Racing Ass’n of Cent. Iowa, 713 N.W.2d 234, 245 (Iowa 2006) (affirming summary judgment when nonmoving party failed to “identify specific facts that reveal the alleged underlying motive”); Hlubek, 701 N.W.2d at 98 (concluding after review of deposition testimony that nonmoving party resisting summary judgment on good-faith immunity defenses failed to “ ‘set forth specific facts showing there is a genuine issue for trial’ ” under [Iowa Rule of Civil Procedure] 1.981(5)); Hoefer v. Wis. Educ. Ass’n Ins. Trust, 470 N.W.2d 336, 338-39 (Iowa 1991) (“While intentional torts ... are generally poor candidates for summary judgment because of the subjective nature of motive and intent, the rule is not absolute and ... there is no genuine issue of fact if there is no evidence.” (Citation omitted.) (Internal quotation marks omitted.)).
Courts applying equivalent subjective good-faith immunity statutes have not hesitated to grant or affirm summary judgment when there was no evidence the defendant was dishonest in reporting to the child abuse investigator. See, e.g., Wolf v. Fauquier Cnty. Bd. of Supervisors, 555 F.3d 311, 319 (4th Cir.2009); Watson v. County of Santa Clara, 468 F.Supp.2d 1150, 1156-57 (N.D.Cal.2007); O’Heron v. Blaney, 276 Ga. 871, 583 S.E.2d 834, 836-37 (2003); Baldwin Cnty. Hosp. Auth. v. Trawick, 233 Ga.App. 539, 504 S.E.2d 708, 710 (1998); J.S. v. Berta, 456 S.W.3d 19, 24 (Ky.Ct.App.2015); S.G. v. City of Monroe, 843 So.2d 657, 661-64 (La.Ct.App.2003); Rite Aid Corp. v. Hagley, 374 Md. 665, 824 A.2d 107, 121-23 (2003); Yuille v. State, 111 Wash.App. 527, 45 P.3d 1107, 1110-11 (2002); Whaley v. State, 90 Wash.App. 658, 956 P.2d 1100, 1106-07 (1998); Lesley v. Department of Social and Health Services, 83 Wash.App. 263, 921 P.2d 1066, 1075-76 (1996); Thomas v. Sumner, 341 P.3d 390, 400-01 (Wyo.2015). As the U.S. Court of Appeals for the Fourth Circuit concluded:
In other words, the statufy provides that immunity will dissolve only in those infrequent circumstances where someone used the reporting system for purposes other than that for which it was designed — namely, the protection of children. It is very clear what the General Assembly wished to do, and we will not make public policy of our own by pursuing a different course — specifically, that of discouraging the reporting of suspected child abuse by exposing either *12 mandatory or voluntary reporters to the significant risk of civil liability. Viewing the evidence in the light most favorable to plaintiffs suggests that Stephens was at worst negligent in making the report, and negligence is a far cry from “bad faith.”
Plaintiffs have not alleged or suggested any untoward animus, pre-existing bad blood, desire for revenge, or the like that would strip Stephens of immunity.
Wolf, 555 F.3d at 319. The Watson court required proof the defendant knowingly made a false report or recklessly disregarded its truth or falsity because permitting a lesser showing to avoid immunity
would discourage reporting and invite protracted litigation. Indeed, the protections of [California Penal Code] § 11172 would be meaningless if immunity applied only after defendants are able to assert and prove its application in litigation. Thus, plaintiffs’ claims fail unless they properly allege facts showing that defendants are not subject to § 11172 immunity. In addition, under § 11172, to the extent plaintiffs claim that defendants are not mandatory reporters, plaintiffs nevertheless must allege facts showing that § 11172 immunity does not apply because the report was false and the person making the report knew the report was false when made or made the report with reckless disregard of the truth or falsity. Plaintiffs have not done so.
Watson, 468 F.Supp.2d at 1157 (citation omitted).
The Georgia Supreme Court declined to read an objective reasonableness standard into that state’s immunity statute because to do so would make it more difficult to grant summary judgment and increase litigation risk, resulting in a chilling effect on reporting child abuse:
A subjective standard is even more appropriate under the child abuse reporting statute because it ... imposes criminal penalties. Thus, the relevant question is whether the reporter honestly believed she had a duty to report. A reporter acting in good faith will be immune even if she is negligent or exercises bad judgment.
[[Image here]]
... The court of appeals confused the two separate aspects of immunity under the statute, superimposing a requirement of reasonableness on the good faith standard. Under the court of appeals standard, even if a reporter has reasonable cause to believe that child abuse has occurred, a jury question could still exist on the issue of bad faith. This interpretation chills the reporting requirement and fails to honor the legislative goal of protecting children by encouraging the reporting of suspected child abuse.
O’Heron, 583 S.E.2d at 836-37 (footnotes omitted). The Georgia Court of Appeals elaborated on the subjective good-faith standard and distinguished medical negligence in holding medical defendants were entitled to summary judgment:
Bad faith is the opposite of good faith, generally implying or involving actual or constructive fi-aud; or a design to mislead or deceive another; or a neglect or refusal to fulfill some duty, not prompted by an honest mistake as to one’s rights or duties, but by some interested or sinister motive. Bad faith is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will. Standing alone, the failure of [the medical center’s] personnel to take into consideration the effect *13 [the child’s] prescription medicine might have had on the results of her urine test at most constitutes evidence that [the medical center] was negligent or guilty of exercising bad judgment in forming its professional opinion that [the child] might be the subject of child abuse. However, ... [evidence] of mere negligence or bad judgment is not [equivalent to evidence of a] refus[al] to fulfill [a] professional dut[y], out of some interested or sinister motive, [nor is it equivalent to evidence of a conscious act based on] some dishonest or improper purpose.
Baldwin Cnty. Hosp. Auth., 504 S.E.2d at 710 (citation omitted) (internal quotations marks omitted).
Washington appellate courts have discussed the proper role of summary judgment .on the issue of subjective good-faith immunity in several child abuse reporting cases. In affirming summary judgment for a defendant physician and hospital, the Washington Court of Appeals stated:
Good faith flows from a “mind indicating honesty and lawfulness of purpose.” Good faith is wholly a question of fact. But if reasonable persons could reach but one conclusion, summary judgment is appropriate.
The Yuilles complain that Dr. Feld-man and the Hospital reported the abuse here without properly verifying medically that any abuse occurred. Even assuming this is correct, it is insufficient. The statute does not require that the information giving rise to the suspicion of abuse be investigated or verified before it is reported. The duty to investigate lies with the authorities, not the individual making the report. So the failure to verify or investigate does not rule out immunity.
Yuille, 45 P.3d at 1111 (quoting Whaley, 956 P.2d at 1106). The same appellate court emphasized that evidence of dishonesty is required to avoid summary judgment on the good-faith immunity defense:
The standard definition of good faith is a state of mind indicating honesty and lawfulness of purpose. Nothing in the record suggests that Hupf was dishonest in reporting her suspicion of abuse or that' she acted with any unlawful purpose. The fact that she, as a child care provider, was subject to criminal penalties if she reasonably suspected abuse and failed to report it is a compelling consideration on the side of concluding her purpose was lawful.
Whaley, 956 P.2d at 1106 (footnotes omitted). In yet another decision, the Washington Court of Appeals held a physician was entitled to summary judgment on the good-faith immunity defense when no evidence indicated he acted in bad faith. Lesley, 921 P.2d at 1076.
In Rite Aid Corp., Maryland’s highest court surveyed cases from other jurisdictions, including our decision in Garvis, to hold a subjective good-faith standard applied for that state’s statutory immunity defense and required proof of dishonesty to avoid summary judgment. 824 A.2d at 116-19. The Rite Aid Corp. court acknowledged “questions involving determinations of good faith which involve intent and motive ‘ordinarily’ are not resolvable on a motion for summary judgment.” Id. at 119. But, the high court went on to say “ ‘even in cases involving intent and motive, if the prerequisites for summary judgment are met — there [being] no material dispute of fact — summary judgment may be granted.’” Id. (quoting Gross v. Sussex, Inc., 332 Md. 247, 630 A.2d 1156, 1161 (1993)). In holding the defendants were entitled to summary judgment, the Rite Aid Corp. court stated:
For the respondents to oppose the summary judgment motion successfully, they must have made, a showing, sup *14 ported by particular facts sufficient to allow a fact finder to conclude that Mr. Rosiak lacked good faith in making the report of suspected child abuse. They might have done so by producing specific facts showing that Mr. Rosiak knew, or had reason to know, that the photographs did not depict a form of child abuse and, in total disregard of that knowledge, filed a report anyway. What the respondents have produced are general allegations, that simply show that all of Mr. Rosiak’s actions in making the report can be second guessed. Legitimizing this sort of Monday-morning quarterbacking would render the immunity conferred by [Maryland Code Annotated, Courts and Judicial Proceedings] § 5-620 and [Maryland Code Annotated, Family Law] § 5-708 essentially useless.
Id. at 121.
The Wyoming Supreme Court applied that state’s subjective good-faith immunity statute to affirm summary judgment dismissing a father’s lawsuit against his son’s counselor. Thomas, 341 P.3d at 400. The court emphasized evidence of negligence was insufficient to defeat the immunity; to avoid summary judgment, plaintiff must have evidence defendant acted in bad faith, defined “as acting with a malicious motive or making deliberately false accusations.” Id. at 400-01 (citing Elmore v. Van Horn, 844 P.2d 1078, 1083 (Wyo.1992)). The Kentucky Court of Appeals affirmed summary judgment dismissing a father’s lawsuit against a psychologist who performed a custody evaluation. J.S., 456 S.W.3d at 23-24. The court noted that while good faith is a subjective “ ‘determination of the state of the mind of the actor,’ ” id. at 23 (quoting Norton Hosps., Inc. v. Peyton, 381 S.W.3d 286, 292 (Ky.2012)), summary judgment is appropriate when there is insufficient evidence of bad faith such as “acting with knowledge of the information’s falsity.” Id.
Conversely, courts have denied summary judgment when there was evidence the defendant acted dishonestly reporting child abuse. See, e.g., Owen v. Watts, 307 Ga.App. 493, 705 S.E.2d 852, 855 (2010) (concluding that the defendant had ulterior motives for a report when the parties were long-standing adversaries in petitions to adopt a child); J.E.B. v. Danks, 785 N.W.2d 741, 750 (Minn.2010) (concluding there was evidence of “personal spite” and exaggerated language in the child abuse report that supported a finding of actual malice).
The summary judgment record in this case is devoid of evidence from which a jury could find Dr. Lindaman acted dishonestly — that is, that he believed the statements he made to the DHS were untrue. To the contrary, one of the plaintiffs experts conceded that Dr. Lindaman “believed ... in his own mind” what he was saying to the DHS and the other expert said, repeatedly, that he had no opinion as to Dr. Lindaman’s state of mind. Summary judgment therefore was appropriate on statutory immunity.
The Nelsons argue immunity should not apply because Dr. Lindaman failed to cooperate with the DHS. They rely on his affidavit stating, in part, that he “refused to give [the DHS] any opinion regarding the credibility of the father’s story or regarding child abuse.” (Emphasis added.) But, a person does not need to give an opinion on the ultimate issue in order to be “aiding and assisting in an assessment of a child abuse report.” It is undisputed that Dr. Lindaman gave the DHS his biome-chanical opinion that the fracture he observed could have been caused in the manner described by the father. The DHS relied on Dr. Lindaman in part in assessing whether the child was abused. He *15 thereby aided in its assessment. That brings him within the scope of .the statutory immunity. That he declined to say more does not defeat the immunity. There is no evidence Dr. Lindaman had a definitive opinion he intentionally withheld from Brown about the father’s credibility or child abuse.
To allow this lawsuit to proceed would unwind statutory immunity. Many people when dealing with the government are hesitant to offer views on whether individuals under investigation are or are not guilty or are or are not lying. To deny immunity to a doctor who offers his medical observations in good faith but declines to go this extra step would deter doctors from responding to DHS inquiries altogether out of fear of being sued.[5]
■The Nelsons also criticize the scope of the examination that Dr. Lindaman performed on June 26. But, the criticism does not relate to Dr. Lindaman’s medical treatment of E.N.’s fracture. Rather, plaintiffs’ argument is that Dr. Lindaman should have done more to look for signs of child abuse, and if he had done more, he would have offered different opinions to the DHS. Again, there is no claim that Dr. Lindaman acted in bad faith; plaintiffs’ argument is merely that Dr. Lindaman was negligent in performing his role in E.N.’s child abuse assessment.
Defendants moved for summary judgment on several other grounds — lack of evidence to prove causation or'the willful and wanton misconduct required for punitive damages. Because we conclude the immunity defense is dispositive, we do not reach those alternative grounds for summary judgment. •
IV. Disposition.
For those reasons, defendants, were entitled to summary judgment on all claims based on the immunity in Iowa Code section 232.73. We therefore reverse the district court’s order denying their motion for summary judgment and remand the case for entry of an order granting summary judgment in favor of defendants.
REVERSED AND REMANDED WITH DIRECTIONS.
All justices concur except CADY, C.J., who concurs specially, and APPEL and HECHT, JJ., who dissent.

. The Nelsons sued Dr. Lindaman personally as well as “Lynn M. Lindaman, M.D., P.L.C. d/b/a Lindaman Orthopaedic.” We will refer to both as "Dr. Lindaman.”

. The Nelsons do not specifically argue on appeal that the district court abused its discretion by allowing the amendments. The Nelsons’ appellate brief argues the amendments were untimely, but articulates no unfair prejudice resulting from the delay in pleading the immunity defense. We conclude the district court acted within its discretion by allowing the amendments and, therefore, reject the Nelsons' waiver argument.

. A look at the current Code illustrates this point. See, e.g., Iowa Code § 85.20(2) (2015) (providing coemployees immunity from a workers’ compensation or negligence claim, but allowing claims against coemployees alleging “gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another”); id. § 669.14(8)-(9) (immunizing the state for negligent design or construction, but allowing claims based on gross negligence); id. § 670.4(1 )(g)-(h) (granting the same immunity as section 669.14(8)-(9), but for government subdivisions). Other statutes exclude from immunity ^ provisions claims of intentional or knowing breach of duty. See, e.g., id. § 28H.4(2) (immunizing directors and officers of a council of governments “except for acts or omissions which involve intentional misconduct or knowing violation of the law, or for a transaction for which the person derives an improper personal benefit”); id. § 497.33 (immunizing a director, officer, member, or volunteer of a cooperative association except for improper benefit, intentional infliction of harm to the cooperative, or intentional violation of law); id. § 504.901 (immunizing a director, officer, employee, member, or volunteer of a nonprofit corporation except for financial benefit, intentional harm, or an intentional violation of law); id. § 613.19 (granting the same level of immunity to directors, officers, employees, members, trustees, or volunteers of any nonprofit organization); id. § 669.24 (immunizing state volunteers from personal liability “except for acts or omissions which involve intentional misconduct or knowing violation of the law or for a transaction from which the person derives an improper personal benefit”). Yet, another set of immunities protects conduct short of actual malice or a criminal offense. See, e.g., id. § 461C.6 (recreational immunity exception allowing claims for “willful or malicious failure to guard or warn”); id. § 669.14(13) (allowing claims based on an "act or omission [that] constitutes actual malice or a criminal offense”); id. § 669.21 (requiring indemnification for tort claims against state employee unless the claim was based on “a willful and wanton act or omission or malfeasance in office”).

. Again, a look at the current Code illustrates this point. See, e.g., Iowa Code § 9IB.2 (immunizing employers who provide work-related information about a current or former employee "in good faith,” but not if the employer acted with malice or the information "knowingly is provided to a person who has no legitimate and common interest”); id. § 135.147 (granting immunity to a person who "in good faith and at the request of ... the department of public defense renders emergency care or assistance to a victim of the public health disaster ... unless such acts or omissions constitute recklessness”); id. § 613.17 (giving immunity to any person who "in good faith renders emergency care or assistance without compensation ... unless such acts or omissions constitute recklessness or willful and wanton misconduct”); id. § 915.3 (immunizing "[a]ny person who, in good faith and without remuneration, renders reasonable aid or assistance to another against whom a crime is being committed ...” without any additional qualifying words).

. Notably, plaintiff's counsel conceded at oral argument that if Dr. Lindaman had said nothing to the DHS he could not have been sued. Moreover, the very opinion that Dr. Linda-man declined to give to the DHS, i.e., whether the father was credible or not, is one that normally would not be allowed to be given in a courtroom. See State v. Dudley, 856 N.W.2d 668, 677 (Iowa 2014) (reaffirming our commitment “to the legal principle that an expert witness cannot give testimony that directly or indirectly comments” on the credibility of a witness); State v. Myers, 382 N.W.2d 91, 97 (Iowa 1986) (stating "most courts reject expert testimony that either directly or indirectly renders an opinion on the credibility or truthfulness of a witness”).