# IN THE COURT OF APPEALS OF IOWA

No. 20-0807
Filed June 30, 2021

**KENNETH LEROY ADAMS,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Cerro Gordo County, Chris Foy, Judge.

Kenneth Adams appeals the denial of his request for postconviction relief.

**AFFIRMED.**

Dylan J. Thomas, Mason City, for appellant.

Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee State.

Considered by May, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Kenneth Adams appeals from the denial of his application for postconviction relief (PCR) following his conviction for child endangerment resulting in death. Adams asserts the PCR court erred in rejecting three ineffective-assistance-of-counsel claims. His first claim, that trial counsel was ineffective for failing to seek exclusion of a medical examiner's expert opinion testimony on cause and manner of death, is twofold. He argues trial counsel should have sought exclusion because (1) the medical examiner's testimony was unreliable and had little scientific basis and (2) was based entirely on information provided by law enforcement. Next, Adams claims trial counsel was ineffective for failing to move for a mistrial after the medical examiner questioned his trial counsel's knowledge of copyright law on cross-examination. Finally, Adams asserts trial counsel was ineffective for failing to request a jury instruction stating guilt cannot be inferred from a criminal defendant's decision not to testify at trial.

**I. Facts and Earlier Proceedings.**

Adams was found guilty of child endangerment resulting in death after a jury trial in 2013. The following evidence was presented at trial:

> In a recorded interview, Adams told law enforcement officers the child got upset when his mother left, threw a tantrum, and "bashed [him] in the face." Adams was angered by the child's action. He told the child not to do that and instructed him to lie down. Adams threw a pillow on the couch, grabbed the child's pants and "flipped him up" onto the couch, placing him face down on the pillow. He held the child's arm and stroked his back until the child's breathing slowed down. At that point, Adams "turned [the child's] face slightly so that his face was sitting out" because he was concerned about sudden infant death syndrome. He played video games with his older son, cleaned the upstairs bathroom, and returned to play videogames, before noticing something was wrong with the child.

Adams called 911 on a recorded line. He informed the dispatcher his son was not breathing and his eyes were glassy.

Law enforcement officers and paramedics arrived at the scene and attempted life-saving procedures, to no avail. According to one officer, the child "was limp, and his face was blue."

. . . .

The State medical examiner testified the cause of the child's death was suffocation. . . . He ruled the manner of death a homicide based on Adams' admission to holding the child's arm. The medical examiner eliminated other reasonable causes of death, including choking on vomit, trauma from the child's "head butt" of his father, ear infection or cold, and sudden infant death syndrome.

*State v. Adams*, No. 13-1852, 2015 WL 799542, 1–*2 (Iowa Ct. App. Feb. 25, 2015). Adams appealed, challenging the sufficiency of the evidence supporting his conviction and asserting his trial counsel was ineffective in failing to challenge the medical examiner's testimony as an improper credibility assessment.[1] *Id.* at *1. Our court affirmed his conviction, finding the verdict was supported by substantial evidence. *Id.* at *2. Adams's ineffective-assistance claim was preserved for PCR review. *Id.* at *3.

Adams then filed a PCR application in 2016, raising his first ineffective-assistance claim. He amended the application later that year to include his second claim of ineffective assistance and amended it again in 2017 to include the third ineffective-assistance claim. The parties agreed to forgo a trial and submitted the case to the PCR court based on their briefs and a stipulated record in December

---

[1] Adams also claimed the district court applied an incorrect standard in denying his motion for new trial. Our court agreed; the order denying Adam's motion for new trial was vacated and remanded to the district court with instructions to apply the correct standard. *Adams*, 2015 WL 799542, at *2. On remand, the district court again denied his new trial motion.

2019.[2]  The PCR court issued its ruling in May 2020, denying all claims and grounds for relief presented by Adams.  He appeals.

**II. Standard of Review and Error Preservation.**

We review PCR claims raising ineffective assistance of counsel de novo. *Goode v. State*, 920 N.W.2d 520, 524 (Iowa 2018).

The State generally concedes Adams preserved error on his claim that trial counsel was ineffective for failing to seek exclusion of the medical examiner's expert opinions on the cause and manner of death.[3]  Adams's additional ineffective assistance claims are preserved because they were considered and rejected by the PCR court.  However, the State argues Adams did not specifically preserve error on his claim that trial counsel was ineffective for failing to seek exclusion of the medical examiner's testimony on the basis that he relied heavily on information from law enforcement in forming those opinions.  *See State v. Tyler*, 867 N.W.2d

---

[2] According the PCR court's written ruling, the jointly stipulated record included:
> (1) the file and trial transcript from the underlying criminal prosecution against Adams . . . ; (2) the evidentiary deposition taken in this case of . . . the attorney who represented Adams in his criminal case; (3) the evidentiary deposition taken in this case of [the medical examiner], who testified as an expert for the State at the trial in Adams' criminal case; and (4) the discovery deposition taken of [the medical examiner] in the criminal case.  Adams offered the transcripts of the evidentiary depositions and the curriculum vitae of [the medical examiner] as Exhibits 1, 2, and 3.  The State offered Exhibit A, a transcript of the trial testimony of [the medical examiner] in the criminal case with those parts it believed to be most pertinent highlighted, and Exhibit B, a transcript of the discovery deposition taken of [the medical examiner] in the criminal case with those parts it believed to be most pertinent highlighted.

[3] The medical examiner testified cause of death is "what happened to the person that caused death" and "manner of death is a category of death . . . placed in one of five categories.  And those categories are natural, accident, suicide, homicide, and undetermined."

136, 162 (Iowa 2015) (finding that a medical examiner's opinions on cause or manner of death are normally impermissible when based "largely on witness statements or information obtained through police investigation."). We agree. Adams did not present the *Tyler* claim in any version of his PCR application or the PCR trial brief, and the PCR court did not address the claim or even reference *Tyler* in its final ruling. Adams presents the claim for the first time in this appeal. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). So, we decline to consider this argument.

**III. Analysis.**

"To succeed on a claim of ineffective assistance of counsel, [an applicant] must prove: (1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To show prejudice, "the applicant must demonstrate 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Ledzema v. State*, 626 N.W.2d 134, 141 (Iowa 2001) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "'We begin with the presumption that the attorney performed competently' and 'avoid second-guessing and hindsight.'" *State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011) (citation omitted). The applicant must prove both elements by a preponderance of the

evidence; if the applicant fails to prove one of the elements the claim fails and we need not address the other. *Ledzema*, 626 N.W.2d at 143.

**A. Trial Counsel's Failure to Seek Exclusion of the Medical Examiner's Testimony.**

Adams claims trial counsel was ineffective for failing to seek exclusion of the medical examiner's opinions on cause and manner of death based on the standard of admissibility for expert testimony discussed by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceauticals, Inc.*, 509 U.S. 579, 591–593 (1993), and our supreme court in *Ranes v. Adams Laboratories, Inc.*, 778 N.W.2d 677, 685–686 (Iowa 2010). He argues had trial counsel objected, the medical examiner's testimony would have been inadmissible under a *Daubert/Ranes* analysis and the trial would have ended differently.

We note our supreme court has not fully adopted the *Daubert* standard, and Iowa courts are not required to apply it. *Leaf v. Goodyear Tire and Rubber Co., Inc.*, 590 N.W.2d 525, 531 (Iowa 1999). Iowa courts take a "liberal view of the admissibility of expert testimony." *Ranes*, 778 N.W.2d at 685. As a preliminary matter, courts consider whether expert testimony "will assist the trier of fact" in understanding "the evidence or to determine a fact in issue." *See* Iowa R. Evid. 5.702. This requires the court to consider "the existence of a reliable body of 'scientific, technical, or other specialized knowledge'" and whether "the evidence is relevant in assisting the trier of fact." *Ranes*, 778 N.W.2d at 685 (citing *Johnson v. Knoxville Cmty. Sch. Dist.*, 570 N.W.2d 633, 637 (Iowa 1997)). Next, "the court must determine if the witness is qualified to testify 'as an expert by knowledge, skill, experience, training, or education.'" *Ranes*, 778 N.W.2d at 685 (quoting Iowa

R. Evid. 5.702). Here, the relevancy of the medical examiner's opinions on cause and manner of death is not in question, nor are his qualifications as a State certified medical examiner with extensive experience performing autopsies. So, our focus is on the medical and scientific underpinning of the medical examiner's testimony.

The medical examiner was asked on cross-examination how he determined the child died from suffocation. He testified:

> It is a combination of processes. Suffocation for the forensic pathologist, there is no definitive finding per se for suffocation. So there is no particular mark. There's not something that we can look at under the microscope to say this is suffocation. What we have to do is look at the circumstances, what we are told, and it's also a process of eliminating all other known reasonable cause of death. So that's what we did in this case. And one of the reasons why we did a complete thorough autopsy and ran numerous different tests to rule out all those other possibilities, and then you're left with what else could cause this death and you correlate that with what we're told and the circumstances surrounding the death.
> . . . .
> We were told eventually that [the child] was placed in a position that his—he was in a prone or facedown position such that his face was in a pillow and that he was held in this position until he stopped moving.

The medical examiner explained that the child would not have suffocated face down on the pillow on his own.[4] Suffocation occurred "because the child [was] prevented from moving his head." Trial counsel replied, "How is he prevented from moving his head?" The following exchange came next:

> A. If the child is held. Now, he doesn't have to be compressing but if he is held in a position such that he cannot move his head enough to get air. Now it doesn't have to be a complete seal. But if it's enough that impairs the air exchange, that's a homicide.
> Q. What do you see in this case in this case that makes you believe his head was held and he couldn't move it? A. I saw a reenactment [by Adams] of the position of the child.

---

[4] The child, at eighteen months old, was in the eighty to ninety percentile range of for both height and weight with no health concerns.

> Q. And you saw a demonstration of my client putting his hand on the head of the child? A. Does not have to be the hand on the head. It just has to be such that the child cannot move in such a position that there can be enough air exchanged.
>
> Q. What did you see that led you to believe the child couldn't move? A. Well, the child is—by doll reenactment is placed such that the head is in the pillow. And that's enough to impair air exchange. Now, if the child were just sleeping and their head—and they can turn. But even if you just prevent the child from being able to turn, even if you hold it with one finger, I'm not talking the whole weight but even just one finger and it's preventing the child from its natural instinct to push away and turn and get enough air, that's a homicide.

The medical examiner went on to explain that in the reenactment video, Adams was straddling the child[5] while holding him down with his hands and stroking his arm. "Stroking the arm is not inconsistent with holding a person in that position as well. You can hold the person and stroke their arm at the same time." Trial counsel later asked, "And you're saying there doesn't have to be a sufficient force to even leave a bruise or some sort of physical finding for that restraint?" The medical examiner replied "Yes," and when pressed for a source he cited a forensic pathology book by Vincent DiMaio. *See* DiMaio, Vincent J. and DeMaio, Dominick, *Forensic Pathology*, Chapter 8 (2nd ed. 2001). Adams claims the source

> did not provide a basis for that opinion but only generally provided general information on asphyxia. . . . As it was a novel situation, no scientific study could be cited nor error rate for same. As well, there was no generally accepted opinion among medical examiners for such a situation.
>
> Common sense would seem to dictate that the medical conclusion that a child of that age could not suffocate from the position he was in on the pillow, but that touching the on the arm with no significant pressure exerted on the body would make the

---

[5] The medical examiner explained straddling "could be anything that's going to inhibit the person to being able to fully turn and have the adequate amount of access to air that they would need in order to survive." He determined Adams straddled the child from watching the reenactment as well as from law enforcement reporting of Adams's own statements.

difference and could cause the child to suffocate is absurd. No scientific methodology could support such a conclusion.

We agree with the PCR court that our holding in *State v. Garcia-Miranda* is instructive here. No. 05-1870, 2007 WL 1345848, at *2-3 (Iowa Ct. App. May 9, 2007). The defendant in *Garcia* was on trial for first-degree-murder and objected to the admissibility of opinion testimony of three medical experts over the time frame between injury and death. *Id.* at *1. The defendant argued "there were no existing studies giving reference to a child's possible survival time after suffering certain injuries; sufficient data . . . [did] not exist." *Id.* at *2. In rejecting his claim, our court found "it would be impractical to require the doctors to base their opinions on published data or research in the present case. As the doctors testified, it was impossible to conduct controlled scientific studies on the topic because it would involve intentional infliction of serious injuries on human subjects." *Id.*

Such was the case here. The medical examiner acknowledged his opinions were not the sort that could be tested other than on a child-sized doll. He reached his conclusion based on the autopsy, his knowledge and expertise, the video reenactment, and information from law enforcement regarding Adams's own statements in a recorded interview. Even though he admitted he did not watch the entire seven-hour interview or read the full transcripts of the interviews, the medical examiner noted objective findings supporting his opinions. During the autopsy, the medical examiner observed external bruising behind the child's ear along with a "total of eleven different discrete areas of hemorrhage or bleeding into that fatty tissue just beneath the scalp." He attributed those marks to some sort of trauma requiring blunt force, such as a deep squeeze or pressure. Along with those

observations, he stood by his opinion that the child died from suffocation due to Adams holding him face down in the pillow: "Yes. It's a high degree of medical certainty. I think that is what happened."

The defendant in *Garcia* also argued the district court erred in failing to conduct a *Daubert* "preliminary assessment of whether or not the reasoning or methodology underlying the testimony was scientifically valid and whether or not it could be properly applied to this case." *Id.* at *3. Our court rejected that claim as well, finding:

> [T]he doctors were not introducing new theories or explaining complex methodologies. Testimony regarding forensic pathology has been widely used in court proceedings. The doctors' testimony concerned the mechanism of injury, their observation of the injuries, the cause of death, and the blood collection process. It was quite plain and easy to understand. The jury would have sufficient knowledge and personal experience to decide the credibility of the testimony and to give it proper weight. It [was] unnecessary to require a preliminary assessment.

*Id.* We think the district court would have reached the same conclusion had trial counsel objected or otherwise tried to exclude the medical examiner's testimony on cause and manner of death. Trial counsel had no duty to raise a meritless objection. *State v. Greene*, 592 N.W.2d 24, 29 (Iowa 1999). In the words of the PCR court:

> The testimony of [the medical examiner] was admissible to help the jury understand all the evidence presented by the State regarding the circumstances of [the child's] death. It is the opinion of the Court that the testimony given by [the medical examiner] falls within the scope of admissible expert testimony under Iowa R. Evid. 5.702. [Trial counsel] did not breach an essential duty by failing to seek the exclusion of the testimony of [the medical examiner] . . . .

We agree. We find trial counsel did not breach an essential duty on this basis, and we reject Adams's claim.

**B. Failure to Seek a Mistrial.**

Adams claims trial counsel breached an essential duty by failing to move for a mistrial after the following exchange with the medical examiner on cross-examination:

> Q. I asked you to provide two copies of articles or studies. Did you do that? A. I provided you the citations, and I didn't want to photocopy against copyright law.
> Q. Did you give the copies to [the State]? A. I gave you the citations.
> . . . .
> Q. You didn't tell me in deposition that it would be in violation of copyright law.
> . . . .
> A. I think what I said is that I provided you the citations and that I would not do your job, and that basically is that I can't photocopy something that is copyrighted.

On redirect, the State asked the medical examiner, "Did you feel the need to tell a lawyer the laws of copyright?" He replied, "No, I didn't. I felt that she would have been more versed than I." Adams argues that this exchange undermined trial counsel's credibility with the jury, and as a result the jury would have been unable to render a fair and impartial verdict. The PCR court held:

> In the opinion of the Court, Adams exaggerates the significance of the comments made by [the medical examiner]. While the tone of those comments was not respectful, they did not address and had no bearing on any substantive issue in the case against Adams. . . . [T]he Court views the comments . . . as fairly typical of those any witness might make out of frustration or irritation after undergoing cross-examination. It would not characterize these comments as a challenge to the competence of [trial counsel]. Further, the Court does not believe that the jurors would have viewed the comments . . . as an attack on the professional qualifications of [trial counsel]. In any event, Adams did not cite, and the Court is not aware of any case in which a mistrial was granted in a criminal prosecution based on

disrespectful or disparaging comments made by a witness about defense counsel. Without such legal authority, there is no basis for the Court to find that [trial counsel] breached an essential duty by failing to seek a mistrial.

We agree with the PCR court. Now on appeal, Adams again cites no persuasive authority to support his claim that trial counsel's decision not to seek a mistrial amounted to breach of an essential duty. Trial counsel explained in her deposition that she did not seek a mistrial because she did not think the exchange affected her defense. Judgment calls such as this are rarely a basis for finding ineffective assistance, absent a lack of diligence or investigation by trial counsel. *Ledzema*, 626 N.W.2d at 142–43. We find trial counsel did not breach an essential duty by failing to move for a mistrial.

### C. Failure to Request a Jury Instruction.

Lastly, Adams claims trial counsel provided ineffective assistance by failing to request an instruction informing the jury they could not infer guilt based on Adams's decision not to testify at trial. During the record on the jury instructions at trial, the district court asked: "I was going to ask, . . . just for the record, there is an instruction about the defendant not testifying. That has to be given only when the defendant requests that. Do you request that, or do you want to make any additional record on that point?" Trial counsel indicated "I do not, your Honor. Since the *Esse*[6] instruction is given, I don't believe it's necessary."

---

[6] *See State v. Esse*, No. 03-1739, 2005 WL 2367779, at *3-4 (Iowa Ct. App. Sept. 28, 2005) (requiring a limiting instruction regarding the proper use of recorded interrogations). Here, the district court instructed the jury: "Statements and questions by law enforcement officers during interviews with the defendant are not evidence to be-considered for their truth. The defendant's answers and responses to those questions and statements are evidence."

Trial counsel confirmed she strategically decided not to request the instruction because she wanted to refer to Adams's statements in the recorded police interview as his testimony rather than put him on the stand. In closing argument, trial counsel pointed to Adams's conduct and comments during the 911 call and the video interviews as if it were his testimony. In a similar manner, the State also commented on Adams's statements but never referenced his choice to not testify during trial. "Whether counsel breaches an essential duty by failing to offer or object to a particular instruction 'must be determined with regard to the theory of defense which is being employed in the case.'" *State v. Virgil*, 895 N.W.2d 873, 879 (Iowa 2017) (citation omitted). Because the decision to forego this particular instruction was a reasonable trial strategy, we find no breach of an essential duty by trial counsel.

**IV. Conclusion.**

Adams fails to demonstrate breach of an essential duty in any of his ineffective-assistance claims. We affirm the PCR court's denial of relief.

**AFFIRMED.**