**IN THE COURT OF APPEALS OF IOWA**

No. 15-1677
Filed October 12, 2016

**HUDSON HARDWARE PLUMBING & HEATING, INC.,**
        Plaintiff-Appellant,

**vs.**

**AMCO INSURANCE COMPANY,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Black Hawk County, George L. Stigler, Judge.


        Plaintiff-subcontractor appeals the district court's grant of summary judgment in favor of the defendant-insurer, finding the commercial general liability policy issued by the insurer did not cover claims asserted against the subcontractor or general contractor under its policy because the alleged damages were not caused by an "occurrence" within the meaning of the policy. **REVERSED AND REMANDED WITH INSTRUCTIONS.**


        Brandon J. Gray of Redfern, Mason, Larsen & Moore, PLC, Cedar Rapids, for appellant.

        Stephen J. Powell and Dustin T. Zeschke of Swisher & Cohrt, P.L.C., Waterloo, for appellee.


        Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

The underlying declaratory judgment action was precipitated by a commercial construction dispute and resulting civil actions. In this appeal, we are asked to review the district court's grant of summary judgment finding the commercial general liability policy issued by the insurer did not cover the claims asserted against the subcontractor or general contractor under its policy because the alleged damages were not caused by an "occurrence" within the meaning of the policy. Because we agree the district court erred in its interpretation, we reverse and remand the case back to the district court for further proceedings.

## I. Undisputed Facts and Relevant Proceedings.

In December 2008, the Cedar Bend Humane Society (CBHS) contracted with the Samuels Group, Inc. (SG) to design and build CBHS's new animal adoption facility. SG then subcontracted various parts of the project to others. The production of the design plans for the project's plumbing and heating, ventilation, and air conditioning (HVAC) systems was subcontracted to Bracket Engineering Consulting, LLC (Engineering). SG also subcontracted with Hudson Hardware Plumbing & Heating, Inc. (Hudson) to "[p]rovide engineering, labor, material and equipment to design and install" the HVAC and plumbing systems for the project. The window materials and their installation was subcontracted to Allen Glass Co., Inc. (Glass).

Hudson's subcontract with SG obligated Hudson to procure commercial general liability (CGL) insurance to cover Hudson's indemnity obligations under its subcontract, and SG was to be named as an insured. Hudson then obtained

the required policy from AMCO (Policy).  That Policy and its standard CGL policy language are the heart of this matter, which we will further discuss below.

"After the [construction] work was performed, [CBHS] noticed mold, excess humidity, and excess odor in the building," allegedly caused by faults "with the design and installation of the HVAC system."  CBHS subsequently sued SG, Engineering, Hudson, and Glass (collectively Defendants) for breach of contract (Suit).  CBHS's petition specifically asserted Defendants:

> a. Failed to design and install a [HVAC] system in the CBHS facility which provided adequate quantities of heat, cooling and ventilation to the CBHS facility, contrary to the Contract;
> b. Failed to or were unable to make repairs to the [HVAC] system in the CBHS facility, thereby depriving the CBHS of a functioning [HVAC] system which met the contract specifications set forth [in] the Contract;
> c. Failed to properly install windows in the CBHS facility which resulted in water damage, contrary to the Contract; and
> d. Failed to or were unable to make repairs to the windows in the CBHS facility, thereby depriving the CBHS of properly functioning windows which met the contract specifications set forth in the Contract[.]

CBHS alleged that, as a direct and proximate cause of the breach by Defendants, it "incurred substantial expense to renovate, rework and repair the [HVAC] system and the windows negligently installed by Defendants so as to provide adequate amounts of heating, air conditioning and ventilation to the CBHS facility and to provide properly installed windows in the CBHS facility."  In its answer, SG asserted third-party claims against Engineering, Glass, and Hudson.

Hudson filed a claim with AMCO, seeking coverage of Hudson and SG in the Suit under the Policy.  AMCO denied the claim because its "investigation show[ed] that there was no occurrence as defined by [the Policy] and therefore

no grant of coverage exist[ed] for this loss." AMCO also explained that its "review showed that . . . the damages being claimed by [CBHS] d[id] not meet the definition of an 'occurrence' or 'property damage' as defined in [the Policy]."

In a separate action, Hudson filed a petition for declaratory judgment against AMCO, asking the court to declare that AMCO was "obligated to provide coverage to Hudson and [SG] for defense and indemnification in the [Suit], and any related causes of action, under the terms of the [Policy, and] to reimburse Hudson for expenses" incurred in its defense. AMCO answered and denied the Policy covered the claims asserted against Hudson or SG in the Suit, and it argued it was therefore not required to defend Hudson or SG in the Suit.

Dueling motions for summary judgment were filed by the parties. Following a hearing on the motions, the district court entered its ruling, granting AMCO's motion, denying Hudson's motion, and dismissing Hudson's declaratory judgment action. Relying upon the case then most relevant, *Pursell Construction, Inc. v. Hawkeye-Security Insurance Co.*, 596 N.W.2d 67, 69 (Iowa 1999), the district court found AMCO had no duty to defend or indemnify Hudson or SG.

Hudson now appeals.

## II. Standard of Review.

We review a summary judgment ruling interpreting an insurance policy for correction of errors at law. *See Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 235 (Iowa 2015). A grant of summary judgment is only proper if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Iowa R. Civ. P. 1.981(3); *Villarreal v.*

*United Fire & Cas. Co.*, 873 N.W.2d 714, 719 (Iowa 2016). If the dispute concerns only the legal consequences of undisputed facts, summary judgment is appropriate. *See Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2015). But, if the dispute involves facts that might affect the outcome of the suit, given the applicable governing law, an issue of "material" fact exists. *See id.* "We view the evidence in the light most favorable to the nonmoving party, who is entitled to every legitimate inference that we may draw from the record." *Id.* at 6-7.

### III. Discussion.

With that standard in mind, we turn to the general principles concerning insurance policies. "Insurance coverage is a contractual matter" governed by the provisions set out in the policy. *Talen v. Emp'rs Mut. Cas. Co.*, 703 N.W.2d 395, 402 (Iowa 2005). Under Iowa law, the intent of the parties, as determined by the language of the insurance policy, controls the interpretation of the policy. *See Nationwide Agri-Bus. Ins. Co. v. Goodwin*, 782 N.W.2d 465, 470 (Iowa 2010). This requires determining "the meaning of the words that govern its legal effect." *See Nat'l Sur. Corp. v. Westlake Inv., LLC*, 880 N.W.2d 724, 733 (Iowa 2016) (*Westlake*).

We note that the Policy's provisions and language at issue here arise from a contract that is now standard in the liability industry. *See id.*; Scott C. Turner, *Insurance Coverage of Construction Disputes* § 1:5 (2d ed.) (*Turner*). Despite the standardization, it has been said that determining whether there is coverage of claims for the cost to repair or replace defective construction work or products is "the most controversial and difficult of all." *Turner* § 2.46. Because the CGL policies generally have the same standardized language, the same issues have

been litigated in just about every jurisdiction, sometimes with contrary results. *See* Christopher C. French, *Construction Defects: Are They "Occurrences"?*, 47 Gonz. L. Rev. 1, 3 (2012); *see also* Philip L. Bruner and Patrick J. O'Connor, Jr., *Bruner & O'Connor Construction Law* § 11:200 (2016); James Duffy O'Connor, *Construction Defects: "Property Damage" and the Commercial General Liability Policy,* 24 Constr. L. 11 (Spring 2004).

Generally speaking, CGL policies, like the one here, contain an insuring agreement, which "is the core provision of the entire policy, setting forth both the insurer's obligation to pay liabilities and its obligation to defend claims made against the insured." *See Turner* § 1:13; *see also Pursell*, 596 N.W.2d at 69 (discussing parts of CGL policies). "After the insuring agreement 'giveth,' the exclusions 'taketh away.'" *Turner* § 1:14. That is, CGL policies also have "exclusions that take away some of this coverage." *Pursell*, 596 N.W.2d at 69. On top of that, there are generally exceptions to the exclusions. *See Westlake*, 880 N.W.2d at 739. Consequently, "[t]o determine if an insurance policy affords coverage under a particular set of circumstances, we generally look first to the insuring agreement, then to the exclusions and the exceptions to the exclusions." *Id.*; *see also Amish Connection*, 861 N.W.2d at 240. If a term is not defined in the policy, we use its ordinary meaning—one a reasonable, ordinary person would use. *See Westlake*, 880 N.W.2d at 734. However, an "undefined term in an insurance policy must be construed in light of the entire policy, including any exclusions." *Id.* at 735.

### A. *Insuring Agreement.*

As noted above, most insuring agreements set forth an insurer's two main obligations: the duty to defend and the duty to indemnify. *See Turner* § 1:13. While "[t]he two duties are clearly coextensive," *see Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995),

> the duty to defend is said to be a separate, distinct and independent obligation of the insurer. Whereas the duty to indemnify is dependent on the findings in the underlying case and therefore is usually not determined until the conclusion of that action, the duty to defend is determined at the very outset.

*Turner* § 7:1. However, because of the complexity of claims concerning defective construction work, the pleadings in the underlying case are generally, "of necessity, [pled] very broadly," making the duty-to-defend determination complicated. *See id.* § 1:2. "As such, when faced with a general pleading, defense coverage should be triggered in most cases as indemnity coverage cannot be ruled out." *Id.* § 2.46. Thus, the duty to defend is said to be broader than the duty to indemnify. *See United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 656 (Iowa 2002). Ultimately,

> the duty to defend rests solely on whether the petition contains any allegations that arguably or potentially bring the action within the policy coverage. If any claim alleged against the insured can rationally be said to fall within such coverage, the insurer must defend the entire action. In case of doubt as to whether the petition alleges a claim that is covered by the policy, the doubt is resolved in favor of the insured.

*Id.* at 656-57 (citation omitted). "[I]t is permissible for a liability insurer, in determining whether to accept a tendered defense to consider facts beyond the allegations of the petition." *Talen*, 703 N.W.2d at 405. But the "insurer has no duty to defend 'if after construing both the policy in question, the pleadings of the

injured party and any other admissible and relevant facts in the record, it appears the claim made is not covered by the indemnity insurance contract.'" *Id.* at 406 (citation omitted); *see also Turner* § 2:1 (noting "breach of contract claim against the insured triggers the insurer's duty to defend unless both the face of the claim or complaint and a thorough investigation of the facts reveal that the claim cannot possibly include a claim for any item of covered damages").

The Policy's insuring agreement, which includes both the duty-to-indemnify and duty-to-defend language, stated:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for . . . "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.
> . . . .
> b. This insurance applies to . . . "property damage" only if . . . "property damage" is caused by an "occurrence" . . . .

*See also Westlake*, 880 N.W.2d at 732-33 (discussing substantively similar CGL policy language). The Policy contained definitions of the words contained in quotation marks, which were also substantively similar to the standard CGL policy definitions. *See also id.* The Policy defined "property damage" as

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*See also id.* at 733. An "occurrence" was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful

conditions." *See also id.* at 732. The term "accident" is generally not defined in standard CGL policies, and it was not defined in this Policy. *See id.* at 735. However, our supreme court has addressed this issue and concluded "that in the context of a modern standard-form CGL policy containing an exclusion precluding coverage for property damage 'expected or intended from the standpoint of the insured,'"—which is the case here—"the term 'accident' means 'an unexpected and unintended event.'" *Id.* Substituting the relevant definitions into the insuring agreement, AMCO agreed to defend Hudson and SG against any suit seeking damages for physical injuries to, or loss of use of, tangible property that were caused by an unexpected and unintended event. *See, e.g.,* *id.* at 732-36.

In its motion for summary judgment, AMCO's initial argument was two-fold. AMCO first asserted that the Suit was not seeking damages for injuries to tangible property. Additionally, AMCO argued that there was no "occurrence" as a matter of law, citing *Pursell*; our own unpublished case, *W.C. Stewart Construction, Inc. v. Cincinnati Insurance Co*, No. 08-0824, 2009 WL 928871, at *3-4 (Iowa Ct. App. Apr. 8, 2009), which relied upon *Pursell* to reach the conclusion there was no "occurrence"; and an Eighth Circuit case that interpreted Iowa law and relied upon *Pursell* and *W.C. Stewart* to determine there was not an "occurrence." *See Pursell*, 596 N.W.2d 70-73 (discussing CGL policies and the term "occurrence"); *see also Liberty Mut. Ins. Co. v. Pella Corp.*, 650 F.3d 1161, 1176 (8th Cir. 2011) (discussing *Pursell* and *W.C. Stewart*, 2009 WL 928871, at *2-3). Like the Eighth Circuit in *Liberty Mutual*, the district court here relied upon *Pursell* and *W.C. Stewart* in reaching its conclusion that, "[b]y

definition, the alleged defective workmanship performed by [Hudson] was not the result of a sudden event and thus not the result of an 'accident' covered by [the Policy]." Having reached that conclusion, it was not necessary for the court to address AMCO's "property damage" argument, but AMCO reasserts that argument here in the alternative. *See Duck Creek Tire Serv., Inc. v. Goodyear Corners, L.C.*, 796 N.W.2d 886, 893 (Iowa 2011) ("It is well-settled law that a prevailing party can raise an alternative ground for affirmance on appeal without filing a notice of cross-appeal, as long as the prevailing party raised the alternative ground in the district court."). Consequently, we begin our discussion with the "occurrence" argument.

### 1. Was There an Occurrence?

Until recently, the leading Iowa case on the matter was *Pursell*. *See Westlake*, 880 N.W.2d at 736 (discussing *Pursell*, 596 N.W.2d at 67). In *Pursell*, the Iowa Supreme Court

> considered whether a CGL policy covered damages arising from breach-of-contract and negligence claims brought against an insured who failed to construct two houses in a floodplain at the elevation required by city ordinance, thereby causing the houses to be uninhabitable. We treated the claim against the insurer as one for the cost of repairing the insured's own defective workmanship, as the claimed damages were the cost of raising the elevation of the houses by approximately two feet. We concluded the policy did not cover the cost of repairing an insured's own defective work product because "defective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy." In arriving at this conclusion, we reasoned that interpreting the policy to cover repairs to the insured's own defective workmanship would convert the insurer into "a guarantor of the insured's performance" on a contract, causing the policy to take on "the attributes of a performance bond."

*Id.* at 736-37 (discussing *Pursell*, 596 N.W.2d at 67-71).

Recently, the court revisited the "occurrence" definition discussion in *Westlake*, 880 N.W.2d at 724, which was decided after the district court's summary judgment ruling at issue here. In *Westlake*, an insurer appealed the district court's rulings in a declaratory judgment action that found "defective work performed by an insured's subcontractor may constitute an occurrence under the policy" and instructed "the jury to determine whether the claimed damages arose due to an 'accident' constituting an 'occurrence' under the policy by considering 'the viewpoint of the insureds and what they intended or should reasonably have expected.'" *Id.* at 727. Finding no error, the court[1] revisited the definition of "accident" in the context of CGL policies, stating:

> An intentional act resulting in property damage the insured did not expect or intend qualifies as an accident amounting to an occurrence as defined in a modern standard-form CGL policy so long as the insured did not expect and intend both the act itself and the resulting property damage.
> Considered from the standpoint of the insured, "a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly." Accordingly, an intentional act does not constitute an accident that qualifies as an occurrence covered by a modern standard-form CGL policy when the resulting harm "was the natural and expected result of the insured's actions, that is, was highly probable whether the insured was negligent or not."

*Id.* at 736 (citations omitted). The court went on to reject the insurer's argument that *Pursell* stood for the proposition that "defective workmanship *never* constitutes an accident or an occurrence under Iowa law." *Id.* at 736-37 (emphasis added). Noting *Pursell* only concerned damages to an insured contractor's own defective work product, the court found its holding in *Pursell*

---

[1] We note there was a strong dissent in *Westlake* by three of the seven Justices of the Iowa Supreme Court. *See Westlake*, 880 N.W.2d at 744-51.

"was limited by its plain language to situations in which the insured performed defective work and sought coverage for the cost of repairing the defective work product." *Id.* at 737-38. The court "interpret[ed] the insuring agreement in the modern standard-form CGL policy as providing coverage for property damage arising out of defective work performed by an insured's subcontractor unless the resulting property damage is specifically precluded from coverage by an exclusion or endorsement." *Id.* at 740. Under the facts and policy in that case, the court concluded "the defective work performed by the insureds' subcontractors [fell] within the definition of 'occurrence' in the insuring agreement appearing in the . . . policy." *Id.*

Though the court did not overrule *Pursell*, the majority's holding in *Westlake* was a bit of a game changer. *See Westlake*, 880 N.W.2d at 744 (Waterman, J., dissenting) ("The majority disregards [the Eighth Circuit's persuasive decision in *Liberty Mutual* that is] directly on point and instead relies on inapposite Iowa authority finding liability coverage for a landlord's negligent supervision of an employee who flashed tenants." (citing *Shelly Funeral Home*, 642 N.W.2d at 651)). Comparing the facts in *Pursell*—as distinguished by the majority in *Westlake*—with those here, it is clear that the claims in the Suit are not solely claims for damages by Hudson based upon Hudson's alleged defective work product. In discovery in the Suit, CBHS's president elaborated upon CBHS's claims in her affidavit:

> After the work was performed, [CBHS] noticed mold, excess humidity, and excess odor in the building. [CBHS] alleges that the negligence and/or breach of contract of the [SG] and/or the named subcontractors caused ventilation problems in the animal care and adoption building.

> [CBHS] later hired [an expert] to review the construction and documentation associated with the completion. [The expert's] report [found] fault with the design and installation of the HVAC system and stat[ed] that the mold, excess humidity, and excess odor were the result.
>
> As a result of the mold, excess humidity and excess odor [CBHS] alleges was caused by the negligence of the [SG] and/or the named subcontractors, [CBHS] has incurred expenses to remediate the mold, excess humidity and excess odor and to perform certain other repairs and/or improvements to the animal care and adoption building.

The report "found five principle areas where [CBHS] incurred both tangible and intangible costs as a result of design or construction failures," and it listed the following damages and related costs:

- HVAC System Design & Installation Deficiencies
    - HVAC repairs, controls, & Reznor replacement $ 232,002
    - Temporary HVAC $ 8,417
    - Engineering costs $ 30,807
    - Related roofing & curb installations $ 8,987
    - Related construction costs $ 13,976

- Site Drainage & Building Moisture Migration
    - Window repair $ 4,500
    - Window replacement $ 70,902

- Ceilings & Building Material Choices
    - Ceilings $ 7,429
    - Walls & floors $ 60,482

- Plumbing Fixtures valued at $ 40,000

- Loss of Value
    - LEED certification. valued at $ 17,000
    - Construction delays

Given the broad pleadings in the Suit and CBHS's claimed damages to the ceilings, walls, floors, windows, and the roof, among other things, viewing the evidence in the light most favorable to Hudson, it is possible—if not definite—that CBHS claims defective workmanship by Hudson caused damages beyond its

own work that Hudson did not expect or intend, potentially constituting an "accident" that is an "occurrence" within the meaning of the Policy. Stated another way, there is the potential, given the facts alleged in the Suit, that the events were "unexpected." The district court erred in concluding otherwise.

### 2. *Was There Property Damage?*

Because we find the court erred in finding there could be no "occurrence" under the Policy, we must address AMCO's argument the damages alleged in the Suit do not fall within the definition of "property damage" in the Policy. Citing *Yegge*, 534 N.W.2d at 101, AMCO claims the only damages asserted are intangible economic losses that are not covered under the Policy's definition. However, viewing the record in the light most favorable to Hudson, CBHS's claims are not merely claims for "faulty workmanship" or for the cost to finish unfinished work. Rather, the damages alleged, as set out in the expert's report, include damages to tangible property beyond the work product itself, such as the walls. We think, at this stage and given our standard of review, Hudson has shown the claims in the Suit include claims of "property damage" within the meaning of the Policy.

Because the claims against Hudson in the Suit include claims against Hudson for "property damage" caused by an "occurrence" within the meaning of the Policy, we conclude the claims in the Suit are covered under the Policy's insuring agreement.

### B. *Exclusions.*

Having determined that the claims in the Suit are covered under the Policy's insuring agreement, we next turn to the final two steps in our analysis in

which we examine the Policy's pertinent exclusions and then, if applicable, any exceptions to those exclusions. "Insurers relying on exclusions from coverage have the burden to prove their applicability," and, if "an insurer has 'affirmatively expressed coverage through broad promises, [it] assumes a duty to define any limitations or exclusionary clause in clear and explicit terms.'" *Farm Bureau Life Ins. Co. v. Chubb Custom Ins. Co.*, 780 N.W.2d 735, 742 (Iowa 2010) (alteration in original) (citation omitted). "We construe exclusions strictly against the insurer." *Amish Connection*, 861 N.W.2d at 236.

The Policy's exclusions are set forth in several pages and are substantially the same as the standard CGL policy contract. The exclusions at issue here are almost identical to those in *Westlake*, so we need not set them out here. *See* 880 N.W.2d at 732-33.

In *Westlake*, the CGL policy in question was issued by the insurer to the general contractor, and the claims for which the general contractor sought indemnification was based upon the defective work of the general contractor's subcontractor. *See id.* at 739. Considering the same exceptions, the court concluded the policy in its case "plainly contemplate[d] coverage for some property damage caused by defective work performed by an insured's subcontractor." *Id.* The court reasoned that interpreting the CGL policy "so narrowly as to preclude coverage for all property damage arising from negligent work performed by an insured's subcontractor would be unreasonable in light of the exceptions and exclusions the [the CGL policy] contains." *Id.* The court explained:

[T]he policy's "your work" exclusion generally excludes from coverage property damage arising out of completed work performed by or on behalf of the insured. However, the exclusion contains an exception indicating property damage to work performed on behalf of the insured remains compensable assuming no other coverage exclusion applies if it was performed by the insured's subcontractor. Specifically, it states the "your work" exclusion does not apply if "the damaged work or the work out of which the damage arises was performed . . . by a subcontractor" on behalf of the insured. The effect of this subcontractor exception to the "your work" exclusion is to preserve coverage the "your work" exclusion would otherwise negate.

. . . .

We think a reasonable ordinary person who read the modern standard-form CGL policy containing the subcontractor exception to the "your work" exclusion in its entirety would believe it covered defective work performed by the insured's subcontractor unless the resulting property damage was specifically precluded from coverage by an exclusion or endorsement. Accordingly, we interpret the insuring agreement in the modern standard-form CGL policy as providing coverage for property damage arising out of defective work performed by an insured's subcontractor unless the resulting property damage is specifically precluded from coverage by an exclusion or endorsement. In addition, we conclude the defective work performed by the insureds' subcontractors falls within the definition of "occurrence" in the insuring agreement appearing in the [policy at issue here].

*Id.* at 739-40 (alteration in quoted text in original) (internal citations and footnotes omitted).

Here, the Policy insures Hudson and then SG as an additional insured. Though the insureds' positions here are different from *Westlake*, we do not think the differences distinguish this case from the conclusion reached by the court in *Westlake*. As one text explains, the "your work" exclusions in standard CGL policies "are intended to eliminate coverage for the cost of repairing or replacing the insured's faulty work or product, but they do not eliminate coverage for the damage caused by the insured's faulty work or product." *Turner* § 11:10. In

*Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 791 (N.J. 1979), a case regularly cited across jurisdictions, liability policies were explained to work as follows:

> The consequence of not performing well is part of every business venture; the replacement or repair of faulty goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers.
>
> There exists another form of risk in the insured-contractor's line of work, that is, injury to people and damage to property caused by faulty workmanship. Unlike business risks of the sort described above, where the tradesman commonly absorbs the cost attendant upon the repair of his faulty work, the accidental injury to property or persons substantially caused by his unworkmanlike performance exposes the contractor to almost limitless liabilities. While it may be true that the same neglectful craftsmanship can be the cause of both a business expense of repair and a loss represented by damage to persons and property, the two consequences are vastly different in relation to sharing the cost of such risks as a matter of insurance underwriting.
> . . . .
> An illustration of this fundamental point may serve to mark the boundaries between "business risks" and occurrences giving rise to insurable liability. When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case. The happenstance and extent of the latter liability is entirely unpredictable the neighbor could suffer a scratched arm or a fatal blow to the skull from the peeling stonework. . . . [I]njury to persons and damage to other property constitute the risks intended to be covered under the CGL [policy].

*Weedo*, 405 A.2d at 791-92 (citations omitted).

Because the Suit is still pending, no conclusions have been reached as to who, if anyone, caused damages as alleged in the Suit. Viewing the record in the light most favorable to Hudson, the damages alleged are not simply for "the work" of Hudson or SG such that exclusion is absolute. Rather, the pleadings in

the Suit clearly contemplate damages caused by Hudson to other property and may fall outside the exclusion or within the exception to the exclusion such that coverage exists.

We also think this interpretation is supported by the language in the subcontract between SG and Hudson. While that contract is not binding here, it is informative of Hudson and SG's intent. Hudson was required to obtain "contractual liability insurance covering [Hudson's] indemnity obligations under [the subcontract]." The indemnity obligations required Hudson to

> defend, indemnify and hold harmless [CBHS, the owner, SG Design, the architect, SG, the contractor] (including its affiliates, parents and subsidiaries) and other contractors and subcontractors and all their agents and employees from and against all claims, damages, loss and expenses . . . arising out of or resulting from the performance of Subcontractor's Work including, but not limited to: (a) any such claim, damage, loss, or expense [that] is attributable to bodily injury, . . . or to injury to or destruction of tangible property (other than Subcontractor's Work itself) including the loss of use resulting therefrom, to the extent caused in whole or in any part by any negligent act or omission of Subcontractor or anyone directly or indirectly employed by Subcontractor or anyone for whose acts Subcontractor may be liable; and (b) such obligation shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described [here]. Loss or damage due to acts of Subcontractor will be deducted from the amounts otherwise due Subcontractor.

Hudson was also required "to obtain, maintain and pay for such [CGL] insurance coverage and endorsements as will insure the provisions of this subcontract." Additionally, the subcontract mandated that Hudson obtain an additional insured endorsement adding SG as an insured to the policy, with SG receiving "all the same rights and insurance coverage under the [policy] including coverage for completed operations as given [to Hudson]." These terms indicate that SG

wanted to lessen its risk from claims for damages based upon its subcontractor's negligence, and it clearly contemplates that its subcontractor's own work would not be insured. The terms of the subcontract support the conclusion that the "your work" exclusion was not intended to exclude damages to other property caused by the subcontractor's own "work."

Viewing the record in the light most favorable to Hudson, we conclude the claims alleged in the Suit against Hudson and SG may not fall within an exclusion or may fall within an exception to an exclusion such that the claims are covered under the Policy, requiring AMCO to defend Hudson and SG in the Suit.

### C. Duty to Indemnify.

Briefly, we note Hudson requested in its petition for declaratory judgment and its summary judgment motion that it also be declared that AMCO has a duty to indemnify Hudson and SG. At this time, we conclude genuine issues of material fact exist precluding such a declaration. It is conceivable that the fact-finder will determine the damages were caused by Hudson's defective workmanship but the damages were only to its own work, such that there was no "accident" or "occurrence." Similarly, it is also possible that, once facts and damages are determined, the damages fall under one of the Policy's exclusions precluding coverage. We are not commenting on the validity of CBHS's claims or the quality of Hudson's workmanship. Simply, it is impossible to determine the basis, if any, upon which CBHS will recover until that action is completed. *See Emp'rs Mut. Cas. Co. v. Cedar Rapids Television Co.*, 552 N.W.2d 639, 642 (Iowa 1996). Consequently, whether AMCO has an indemnification duty cannot be determined at this time.

*IV. Conclusion.*

In sum, Hudson has shown, as a matter of law, AMCO owed it and SG a defense duty in the underlying action for claims asserted by CBHS. However, neither AMCO nor Hudson have established whether AMCO has a duty to indemnify Hudson or SG at this time. Accordingly, we reverse the district court's summary judgment ruling finding AMCO had no duty to defend or indemnify Hudson or SG. We remand the case for the district court to enter summary judgment in favor of Hudson on its claim AMCO had a duty to defend but deny both parties' motions concerning AMCO's alleged duty to indemnify.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**