# IN THE COURT OF APPEALS OF IOWA

No. 24-0220
Filed July 2, 2025

C.A., by and through JENNIFER ALEXANDER, adoptive mother and legal guardian as next friend, and JENNIFER ALEXANDER in her individual capacity,
    Plaintiffs-Appellants,

vs.

AMERIGROUP IOWA, INC., and ANTHEM, INC.,
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Polk County, John Telleen, Judge.

A mother, on behalf of herself and her daughter, appeals from a district court ruling that granted summary judgment for the defendant insurance companies. **AFFIRMED.**

Alexander E. Wonio (argued) of Hansen, McClintock & Riley, Des Moines, and Tyler M. Smith of Smith Law Firm, PLC, Altoona, for appellants.

James C. Martin (pro hac vice) (argued) and Colin E. Wrabley (pro hac vice) of Reed Smith LLP, Pittsburgh, Pennsylvania, Rebecca R. Hanson (pro hac vice) and Martin J. Bishop (pro hac vice) of Reed Smith LLP, Chicago, Illinois, and Andrew Anderson and Shannon L. Sole of Faegre Drinker Biddle & Reath, LLP, Des Moines, for appellees.

Heard at oral argument by Ahlers, P.J., and Badding and Buller, JJ. Telleen, S.J., takes no part.

**BADDING, Judge.**

Jennifer Alexander adopted her daughter, C.A., from the foster care system when the child was seven years old. For most of her childhood, C.A. was housed in psychiatric medical institutions because of her severe behavioral needs. In 2016, Amerigroup Iowa, Inc., a managed care organization, began delivering healthcare services for our state's Medicaid recipients under a contract with the Iowa Department of Human Services.[1] In Alexander's telling, once Amerigroup and its parent company, Anthem, Inc., began administering C.A.'s Medicaid plan, they pushed to have her moved to lower (and less expensive) levels of care. Alexander alleges that, when she resisted, the insurance companies "caused *five* wrongful child abuse reports" to be filed against her and "attempted to destroy the familial and legal bond between" her and C.A. by suggesting that she should have her daughter adjudicated as a child in need of assistance.

As her daughter's guardian, and on her own behalf, Alexander sued Amerigroup and Anthem for the insurance companies' bad faith in administering C.A.'s Medicaid plan; negligent and intentional infliction of emotional distress; intentional interference with the parent-child relationship; and declaratory relief. The district court granted the insurance companies' motion for summary judgment after reviewing thousands of pages of medical records and documents from healthcare professionals that recommended C.A.'s transition to a lower level of care. Alexander appeals.

---

[1] The Iowa Department of Human Services was later merged with the Iowa Department of Public Health and renamed the Iowa Department of Health and Human Services. For this opinion, we refer to the agency by its name at the time of the events giving rise to this lawsuit.

## I.       Background Facts and Proceedings

C.A.'s early childhood was traumatic.  She was exposed to drugs and alcohol in utero.  After she was born in 2000, her biological parents neglected and abused her—physically and sexually—until she was removed from their home when she was four years old.  From there, C.A. was placed in a series of foster homes where she experienced further neglect and sexual abuse.  By the time she turned six years old, C.A.'s behaviors were too extreme for her foster family to handle, and she was placed at a behavioral health facility.

Alexander, who had been a guidance counselor at a school C.A. attended, adopted her in December 2007 when she was seven years old.  Unfortunately, C.A.'s behaviors did not improve in Alexander's care.  She was physically aggressive with other children and Alexander.  On one occasion, she threw a candlestick at Alexander's head and caused an injury that needed sutures.  C.A. was admitted to the child psychiatric unit at the University of Iowa Hospitals and Clinics at least three times in 2009 for severe aggressive behavior.  She was eventually placed at Villa Santa Maria, a psychiatric medical institution for children (PMIC)[2] in New Mexico.  C.A. was discharged from that facility in 2010.  Alexander blamed the discharge on funding and billing problems, while also reporting to her own psychiatrist that the facility had accused her "of causing problems."

Distressed at the thought of her daughter returning home, Alexander quickly placed her at another PMIC in North Carolina.  C.A. improved at that facility, where

---

[2] An expert witness report for the defendants described a PMIC as "a non-secure institution that provides 24 hours of continuous care and diagnostic or long-term psychiatric services to children (under age 21)."

her medications were adjusted and she learned coping skills to deal with her anger. Despite that improvement, Alexander opposed the facility's recommendation for C.A.'s discharge because she was concerned that C.A. would become physically violent with her again. Alexander's psychiatrist discussed alternatives with her, including having C.A. adjudicated as a child in need of assistance, which could allow the family to access otherwise unavailable services. But in the end, C.A. was discharged into Alexander's home in August 2011.

By 2012, Alexander was reporting backslides in C.A.'s behavior, which led to several more psychiatric hospitalizations. A social worker at one of the hospitals again mentioned seeking a child-in-need-of-assistance adjudication for C.A., but Alexander was not interested. Instead, she pursued another PMIC placement, this time at Piney Ridge Center in Missouri, which offered a program for sexually abusive youths.

C.A. stayed at Piney Ridge from 2013 through 2016. The facility at first focused on stabilizing the residual effects of C.A.'s complex trauma. After about a year, C.A. was "able to regulate her emotions to the point where her behaviors were at the moderate to low severe level." The facility then turned its attention to C.A.'s sexual behavior and her relationship with Alexander, which had deteriorated over the years. By the end of 2015, the treatment team at Piney Ridge was making plans to discharge C.A. to a step-down program the following spring, after she completed the program for sexually abusive youths. Service notes stated "that at some point the insurance was going to also question" whether continued PMIC-level care was necessary. The facility's clinical director later told Alexander: "The reality is—she has been with us for 3 years, she is starting to stagnate (as much

as I'm trying to remain creative), and the insurance company will have something to say about that."

Alexander did not take this news well. She wrote a letter to C.A. after a therapy session that called her daughter a "liar" and "abuser." When staff at Piney Ridge recommended that Alexander not send this letter to C.A., Alexander responded by email:

> I can't do this. I can't see the sociopath she is and curb my reactions. I'm sickened. I'm scared. I'm angry. . . .
> . . . I felt really good about writing this and sending it. I guess I wasn't asking for feedback. I'm her mom, and I'll say to her what I want to say to her. If you think it's abusive, you can take whatever action you feel you need to take. I'm sure you yell at your kids for a hell of a lot less than being a sick sociopath who enjoys toying with others, namely you, as a cat plays with a mouse before the kill. I have to DO something or I'm going to lose it here. My PTSD is off the charts.

A clinical psychologist who tested C.A. in February 2016 did not agree with Alexander's view that C.A. was a sociopath. Despite pressure from Alexander, the psychologist refused to diagnose C.A. with either antisocial personality disorder or reactive attachment disorder, writing that she was "unable to ethically or morally add" those diagnoses because she didn't have the data to support them. That psychologist agreed with C.A.'s treatment team at Piney Ridge that she should not be reunified with Alexander but instead transitioned to treatment in an independent-living setting.

## A.    Amerigroup Iowa, Inc. Enters the Picture

As the treatment team at Piney Ridge was preparing to discharge C.A. to a lower level of care, the Iowa Department of Human Services executed a contract with Amerigroup Iowa, Inc., a managed care organization, to administer health

insurance benefits and case management services to Iowa's Medicaid recipients. The contract's start date was January 1, 2016, but Amerigroup did not begin providing services in Iowa until April.

Alexander enrolled C.A. with Amerigroup while she was looking for new PMIC-level treatment centers. She found one in Utah—the Provo Canyon School. Alexander informed a case manager with Amerigroup that Provo Canyon had approved C.A. for admission into their program, but Alexander refused to allow Piney Ridge "to know anything about the new placement" or "to communicate with Provo Canyon" without her present. A bed opened at Provo Canyon before C.A. finished her sexually abusive youth program at Piney Ridge. Because she did not want to lose the spot at Provo Canyon, Alexander moved C.A. there in mid-April.

## B.     The First Two Child Abuse Reports

A psychiatric evaluation completed two days after C.A. arrived at Provo Canyon estimated that she would "require approximately 24 months in this residential treatment program, followed by transition to an independent living program with intensive outpatient follow-up." But by July, the treatment team recommended that C.A. discharge to a lower level of care or that Alexander consider having C.A. adjudicated as a child in need of assistance. Alexander refused the latter route and challenged the discharge recommendation, maintaining that C.A. was manipulating her therapists into believing that she had improved. In a series of long emails, Alexander called C.A. "sick," "dangerous," "a budding criminal very sick girl," and a "sociopath." She made some similar statements during family therapy sessions with C.A. The treatment team stopped those sessions and reported Alexander to the Utah Division of Child and Family

Services and the Iowa Department of Human Services for emotional abuse. Utah found the report was "unsupported," noting that C.A. "did not disclose great emotional distress" because of Alexander's statements. Iowa did not investigate the report since Utah had already opened an investigation.

After the investigations closed, Provo Canyon moved Alexander and C.A. to supervised communications, while Alexander looked for a new PMIC to care for C.A. In October, the treatment team at Provo Canyon made a second child abuse report to the Iowa Department of Human Services, alleging that

> [C.A.] has been in out of home placements for many years. It is alleged that her mother, Jennifer Alexander, is unable to recognize her progress or accept that she is improving. Jennifer tells [C.A.] that she is a sick person, is a sexual predator and that she will never [b]e well. It is alleged that these allegations are not based on facts, are internalized by [C.A.] and are impeding her ability to make therapeutic progress. The child reacts with verbal and physical aggression, property destruction, demeaning self-talk and panic attacks.

The report was not confirmed.

As she had with Piney Ridge, Alexander refused to allow staff at Provo Canyon to participate in her search for a new facility for C.A. She eventually located a PMIC in Colorado—Devereux Cleo Wallace—that would accept C.A. Even though Devereux was an out-of-network provider and provided a higher level of care than was recommended for C.A., Amerigroup made an individual contract with them and approved C.A.'s admission there. C.A. started at Devereux in December 2016.

## C.     The Third Child Abuse Report

By April 2017, C.A.'s providers at Devereux determined that she was ready for a lower level of care. Devereux and Amerigroup started planning for C.A.'s

discharge, while Alexander actively fought it. With Alexander refusing to participate in the planning, Amerigroup tried to find step-down programs that would accept C.A. They reached out to Piney Ridge, but that facility had one requirement for C.A.'s readmission: "Mom cannot have any involvement with [C.A.] or her treatment, here, including treatment planning." Alexander then revoked Amerigroup's permission to speak to providers on C.A.'s behalf.

To keep things moving forward, Amerigroup's case manager recommended that Alexander explore Lakes Life Skills, a life-skills training center for adult women in Iowa. Alexander informed the case manager that she had talked to the facility and that they would not take C.A. until she was eighteen. When the case manager followed up with Lakes Life Skills, a provider there responded:

> [C.A.'s] mother called me today. I found her a little overwhelming to be honest. . . . I discovered she really was doing reconnaissance for reasons why we would be inappropriate for her daughter! Mum feels her daughter needs somewhere that provides restraints. I explained we were trauma informed and did not utilize restraint. . . .
> She feels that this is a plot by Amerigroup to cut costs and not in her daughter's best interest and as her guardian she calls the shots. . . .
> Long story short, if I have a bed I would consider her recent behaviors and progress and seriously look at taking her. Mum may be a barrier to appropriate goals.

A couple of weeks later, providers at Devereux made the third child abuse report in Iowa against Alexander:

> It is alleged [C.A.] (age 17) is in a residential treatment facility in Colorado and has been recommended for a lower level of care by three different treatment facilities due to the progress she has made overall. Mother, Jennifer Alexander, refuses to participate in discharge planning or cooperate with referrals to agencies that can provide a lower level of care. As a result of mother's refusal to participate in discharge planning, [C.A.] is not receiving care commensurate with her needs.

This report, which was reviewed by the Iowa Department of Human Services as a family assessment, determined that C.A. was safe.

While the parties worked on a discharge plan, Amerigroup approved a funding extension, and Devereux set C.A.'s discharge for October. Amerigroup gave Alexander a list of step-down facilities to contact, but according to Alexander, none of them were willing to admit C.A. When Devereux staff saw what Alexander had told the facilities about C.A., they noted some of the behaviors she listed were either questionable or outright mischaracterizations. With no step-down or other treatment facility in place, the plan changed to discharge C.A. to Alexander's home with outpatient services. Alexander continued to push for residential treatment in increasingly agitated emails that maintained C.A. was dangerous. Devereux agreed to keep C.A. for another week but remained firm with Alexander that they were not going to seek funding authorization from Amerigroup beyond that date. To aid in her transition home, the treatment team formulated a safety plan, which included an instruction to "[l]ock all prescription and over-the-counter medications."

### D. The Fourth Child Abuse Report

C.A.'s first three weeks at home went well, and she asked Alexander for more responsibility. So, despite the safety plan from Devereux, Alexander agreed to let C.A. manage a week's worth of her night-time medications. After an argument with Alexander, C.A. took all the medication available to her in a suicide attempt. She was admitted to Allen Hospital at the beginning of November. After Alexander notified Amerigroup and others about C.A.'s hospitalization, the

healthcare management director with Amerigroup asked employees of the Iowa Department of Human Services to do a safety check:

> We remain concerned about the safety of this child in the mother's home. We are concerned mother is creating situations that are provocative to [the] extent child is attempting to end her life. She is in Allen Hospital presently due to an overdose of trazedone.
> We would like to ask that someone from [the department] do a check with [C.A.] while in the hospital to assess her safety again, now that she is living in her mother's home.

Later that day, an administrator of the department's mental health and disability services made the fourth child abuse report against Alexander, alleging that she "permitted her daughter to have access to medications knowing the child has a recent history of suicidal attempts," and that "[C.A.] overdosed on medications and required medical intervention as a result of her mother allowing her access to the medications." The report was not confirmed.

After a week at the hospital, the doctor caring for C.A. believed that she was ready to be discharged to a lower level of care. He explained that C.A. "has to be managed in the community in order to plan for her future" and that "further institutionalization is not going to help with her behaviors." The hospital's social worker told Alexander the insurance company had found a bed for C.A. at Lakes Life Skills, but Alexander explained that she had already rejected that facility because she did not believe C.A. was "ready for that level of care or assistance."

### E.     The Fifth Child Abuse Report

C.A. returned to Alexander's home towards the end of November. Unfortunately, at the beginning of January 2018, C.A. was hospitalized again—this time at Mercy Hospital—after she swallowed a battery. The doctor who discharged her noted the relationship between C.A. and her mother "is severely pathological

and very dysfunctional." He observed that Alexander displayed "significant provoking behavior from the patient. She will constantly negatively criticize the patient for no apparent reason. She also displayed significant anger towards the patient." The doctor concluded, "In [my] professional opinion she appear[s] to be constantly provoking this child into explosive anger outbursts."

Just a few weeks later, C.A. was back at Mercy Hospital for suicidal thoughts. During her hospitalization, she told her doctor that "she was not really suicidal[,] she just wanted to get away from her mother" and be in "a safer setting." Alexander continued to push for residential treatment, which the doctor did not feel was needed. He later noted, "It appears that at every turn in the close of the treatment the adoptive mother continues to be sabotaging the treatment plan as well as [the] recovery of this patient."

Before C.A. was discharged home, Amerigroup's healthcare management director made the fifth child abuse report to the department:

> It is alleged Jennifer's systematic verbal down grading and forcing her daughter [C.A.] (17) into institutions over the past ten years has caused [C.A.] to make extreme behavior choices like taking an over dose of medications and swallowing a battery to try and harm herself. [C.A.] has not been able to gain the skills to be able to sustain herself alone once she turns age eighteen due to being institutionalized but, Jennifer refuses to allow [C.A.] to participate in a program that will help her gain those skills in a supported environment. Jennifer provokes [C.A.] with degrading and disparaging language causing [C.A.] not to be able to function on a daily basis.

Like the prior reports, this one was also not confirmed.

C.A. was back in the hospital in early February after she ran away and threatened to cut herself. She was discharged to the Cherokee Mental Health Institute, where she did well. Within a month, the treatment team at Cherokee "felt

she had reached maximum benefit of acute psychiatric hospitalization." But, as had been the case with C.A.'s other facilities, discharge planning was difficult.

In May, when C.A. turned eighteen, a social worker at Cherokee presented Lakes Life Skills to Alexander as an option—not knowing Amerigroup had recommended that facility before. Alexander felt Amerigroup was behind the recommendation, although the social worker explained that was not the case. Alexander, who by then had obtained guardianship over C.A.,[3] refused to sign releases that would authorize Cherokee to make referrals to facilities offering a lower level of care. So C.A. languished at Cherokee until September, when an administrator at the Iowa Department of Human Services notified Alexander that C.A. was being discharged because the facility was "currently over census and/or has unmet demands for new admissions." Alexander obtained an injunction preventing C.A.'s discharge. In response, the department petitioned to have Alexander removed as C.A.'s guardian. The parties eventually agreed that C.A. would move to Lakes Life Skills, and Alexander would remain her guardian.

**F.    The Lawsuit**

In August 2019, Alexander filed suit against Amerigroup in her individual capacity and on behalf of C.A. She broadly alleged that the insurance company denied C.A. medically necessary care and then, when Alexander persisted in seeking that care, conditioned its provision on Alexander "relinquish[ing] custody of C.A. to the State of Iowa." Alexander alleged that after she refused "to remove herself from the picture voluntarily," Amerigroup "initiated and coordinated a series

---

[3] An employee at Amerigroup described this as "the worst possible outcome" in a conversation with C.A.'s providers at Cherokee.

of false child protective services investigations and related court proceedings" against her.  Under that framework, Alexander brought claims against Amerigroup and its parent company, Anthem, Inc., for bad faith in administering C.A.'s Medicaid plan; negligent and intentional infliction of emotional distress; and intentional interference with the parent-child relationship.  She also sought declaratory relief.

Four and a half years of litigation ensued, and both parties ultimately moved for summary judgment. The defendants' motion asked the district court to dismiss each of Alexander's claims.  Alexander's motion sought declaratory relief related to the parties' rights and duties under the managed-care contract, as well as a ruling on estoppel issues.  The district court denied Alexander's motion, granted the defendants', and dismissed Alexander's petition.  Alexander appeals.[4]

## II.    Standard of Review

"We review summary judgment rulings for correction of errors at law." *Myers v. City of Cedar Falls*, 8 N.W.3d 171, 176 (Iowa 2024) (citation omitted). The record is viewed "in the light most favorable to the nonmoving party, who is

---

[4] We reject one of Alexander's claims from the start.  Her summary judgment motion asked the district court to disregard the separate corporate identities of Amerigroup and Anthem in establishing Anthem's liability on her claims.  The court declined to do so, finding "that the facts of this case do not justify piercing the corporate veil" and Alexander had "not shown sufficient evidence that Amerigroup is the alter ego of Anthem."  The court continued that "[e]ven if it were proper to pierce the veil, the Court finds no liability accrues to Amerigroup, thus no liability accrues to Anthem."  On appeal, Alexander argues the court erred in ignoring her "claims that Anthem incurred direct, personal liability for its own tortious actions." But Alexander did not call this oversight to the court's attention.  *See 33 Carpenters Constr., Inc. v. State Farm Life & Cas. Co.*, 939 N.W.2d 69, 75 (Iowa 2020).  And our supreme court has routinely held "that when an issue is raised in a motion but not decided in the district court ruling, the issue is not preserved for review."  *Id.* As a result, we analyze the remaining claims only as they relate to Amerigroup.

entitled to every legitimate inference that we may draw" from it. *Id.* (citation omitted). "Summary judgment is proper when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law." *Id.* (citation omitted).

### III.    Analysis

To give some context to Alexander's claims on appeal, we start by summarizing the Medicaid program in Iowa.   "The Medicaid program is a cooperative state-federal program, and while participation is voluntary, 'once a state chooses to participate, it must comply with the federal statutory requirements.'"   *Colwell v. Iowa Dep't of Hum. Servs.*, 923 N.W.2d 225, 237 (Iowa 2019) (citation omitted).  As one federal court has explained:

> The Medicaid Act requires that beneficiaries be permitted to receive healthcare services from participating, qualified providers of their choice (the "freedom-of-choice" provision), and that the state pay those providers directly on a fee-for-service basis according to state-established fee schedules.  States may seek waivers from the requirements of that traditional fee-for-service program.  In particular, states may seek a waiver of the "freedom-of-choice" provision to provide healthcare services to Medicaid beneficiaries through managed care systems.  In such systems, private contracting managed care organizations ("MCOs") administer the Medicaid program for their members, contract with a network of providers, arrange for care, and pay providers for their services.  Medicaid beneficiaries enrolled in managed care plans receive care from only those providers designated by the MCO, except that emergency care providers cannot be restricted.  Both the waiver itself and the contracts between MCOs and the state must be approved by the federal government, and the contracts must comply with a series of statutory and regulatory requirements.

*Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*, 817 F. Supp. 2d 515, 517 (E.D. Pa. 2011) (footnotes omitted) (citing 42 U.S.C. §§ 1396–1396v).

The Iowa Department of Human Services manages Iowa's Medicaid program through the managed-care model. *See Good v. Iowa Dep't of Hum. Servs.*, 924 N.W.2d 853, 858 (Iowa 2019). Under this system, the "MCO is required to 'provide, at a minimum, all benefits and services deemed *medically necessary* that are covered under the contract with the agency' in accordance with the [department's] standards." *Id.* (quoting Iowa Admin. Code r. 441-73.6(1)). The department entered into a managed-care contract with Amerigroup in 2015, with a stated purpose of providing "high quality healthcare services in the least restrictive manner appropriate to a member's health and functional status." Amerigroup began providing services under that contract in April 2016.

With this background, we turn to Alexander's first claim on appeal—that the district court erred in dismissing her cause of action for Amerigroup's bad faith in administering C.A.'s Medicaid plan.

### A. Third-Party Beneficiaries

Alexander's bad-faith claim asserted that Amerigroup owed an implied "duty of good faith and fair dealing" under its "contract to [a]dminister Plaintiff C.A.'s Medicaid plan." She alleged Amerigroup breached that duty "based on its continuous and ongoing bad faith denial of health care claims for C.A. and Amerigroup's unlawful interference with  Alexander's parental rights." Amerigroup sought summary judgment on that claim, arguing that it did not owe Alexander or C.A. a duty of good faith and fair dealing because they were not third-party

beneficiaries to its contract with the department. The district court agreed with Amerigroup,[5] and we do too.

"To sue for breach of contract, one normally needs to be a party to the contract." *Rath v. Arch Ins.*, No. 23-0157, 2024 WL 1548794, at *4 (Iowa Ct. App. Apr. 10, 2024). "But Iowa law recognizes an exception to this general rule—an intended third-party beneficiary of a contract may sue under the contract to remedy the breach of a duty benefitting the third party." *Id.* "[T]he primary consideration in deciding whether nonparties to an agreement are third-party beneficiaries thereof is whether the contract manifests an intent to benefit those parties." *Walters v. Kautzky*, 680 N.W.2d 1, 4 (Iowa 2004).

This standard comes from our supreme court's adoption of the Restatement (Second) of Contracts § 302 (Am. L. Inst. 1979), which provides:

> (1) *Unless otherwise agreed upon between promisor and promisee*, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(Emphasis added.)

---

[5] In challenging the district court's summary judgment ruling, Alexander relies on an earlier ruling by a different judge partially denying Amerigroup's motion to dismiss. That ruling adopted Alexander's third-party beneficiary argument and found "the Contract when read as a whole does not exclude nor prevent a member-beneficiary from seeking reprieve under its terms." But a "district court judge may review and change a prior interlocutory ruling of another district court judge in the same case," as happened here. *McCormick v. Meyer*, 582 N.W.2d 141, 144 (Iowa 1998).

Under this provision, "[w]hen a contract expressly negates the creation of third-party beneficiaries, we have rejected the claim that such status exists." *RPC Liquidation v. Iowa Dep't of Transp.*, 717 N.W.2d 317, 320 (Iowa 2006). Amerigroup's contract with the department includes such an express disclaimer in its "General Terms for Services Contract":

> **No Third Party Beneficiaries.** There are no third party beneficiaries to this Contract. This Contract is intended only to benefit the State and the Contractor.

The supreme court considered an almost identical disclaimer in *Walters*, where prison inmates claimed to be third-party beneficiaries of an agreement between the Iowa Department of Corrections and the state public defender to provide legal assistance to inmates. 680 N.W.2d at 2–3. The court rejected the inmates' claim, finding the agreement—which provided "[t]here are no third party beneficiaries to this Agreement" and "[t]his Agreement is intended only to benefit the DOC and the Public Defender"—expressly negated any intention to benefit the inmates. *Id.* at 3–4. Similarly, in *RPC Liquidation*, the supreme court considered whether a material supplier was a third-party beneficiary to contracts between the Iowa Department of Transportation and bridge contractors. 717 N.W.2d at 318. Each of the contracts provided, "it is specifically agreed between the parties executing this contract that it is not intended by any of the provisions of any part of the contract documents to create in the public or any member thereof a third party beneficiary hereunder." *Id.* at 320–21 (emphasis removed). The court concluded that language "clearly express[ed] the intent of the parties to exclude anyone from having third-party beneficiary status." *Id.* at 322.

The district court relied on these cases in finding that Alexander and C.A. were not third-party beneficiaries of Amerigroup's contract with the department. Alexander argues the court erred in reaching that conclusion because it "failed to consider the language of the contract as a whole and the circumstances of its execution." She contends the express disclaimer here must be disregarded because it conflicts with more specific provisions in the contract that identify "various rights of Medicaid beneficiaries." Typically, "when a contract contains both general and specific provisions on a particular issue, the specific provisions are controlling." *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 688 (Iowa 2020) (citation omitted). But we do not see any conflict that requires application of this principle of contract construction.

As Alexander recognizes, the specific provisions that she relies on "expressly incorporate[d] a variety of 'rights' that the federal government requires Medicaid administrators to afford to 'enrollees' under 42 C.F.R. § 438.100." But, as other courts have concluded, specific provisions in a managed-care contract requiring "compliance with existing statutory or regulatory provisions do not indicate mutual intent to benefit a non-party; they evince intent to comply with applicable law." *Medevac MidAtlantic*, 817 F. Supp. 2d at 529; *accord Prince George's Hosp. Ctr. v. Advantage Healthplan Inc.*, 985 F. Supp. 2d 38, 48 (D.D.C. 2013) (finding the inclusion of a term requiring reimbursement from an MCO as a matter of statutory obligation "is not indicative of any intent on the part of the signatories to benefit" a third party to the contract); *Allen v. Tex. Child.'s Health Plan*, 649 S.W.3d 830, 836 (Tex. App. 2022) (concluding Medicaid recipients "cannot carry their burden to demonstrate they are third-party

beneficiaries under the [MCO] Contract merely by reference to the Contract's purpose or the intended use of services provided under the Contract").

We agree with the reasoning of these courts and find that the contract's inclusion of federally-required terms in its special terms appendix does not override its express third-party beneficiary disclaimer. This conclusion does not leave Alexander or others in her position without a remedy, as she suggests on appeal. Amerigroup members also have access to a grievance process, an appeal process, and a fair-hearing system, which are outlined in their member handbooks. *See* Iowa Code § 249A.4(11); Iowa Admin. Code r. 441-7.4. For these reasons, we affirm the district court's grant of summary judgment on Alexander's bad-faith claim.

## B.    Qualified Immunity

Alexander next claims that the district court erred in finding Amerigroup was immune under Iowa Code section 232.73 (2019) from any liability stemming from the five child abuse reports on her claims for negligent and intentional infliction of emotional distress. Section 232.73(1) provides that a "person participating in good faith in the making of a report . . . or aiding and assisting in an assessment of a child abuse report pursuant to section 232.71B, shall have immunity from any liability, civil or criminal, which might otherwise be incurred or imposed." This section grants a form of qualified immunity—a question of law appropriate for summary judgment. *Nelson v. Lindaman*, 867 N.W.2d 1, 7 (Iowa 2015).

To determine good faith under section 232.73(1), courts use a subjective standard, where "reasonableness and the objective standard play no part." *Id.* at 8 (citation omitted). The inquiry "rests on a defendant's subjective honest belief that

the defendant is aiding and assisting in the investigation of a child abuse report." *Garvis v. Scholten*, 492 N.W.2d 402, 404 (Iowa 1992). Negligence is not enough. *Id.* "To avoid summary judgment, the plaintiff must have evidence the defendant acted dishonestly, not merely carelessly, in assisting" the department. *Nelson*, 867 N.W.2d at 8. We agree with the district court that "[s]uch evidence is totally absent from this case."

On appeal, Alexander still fails to identify evidence that Amerigroup acted dishonestly, either with the one report that it made or with the others Alexander contends that it orchestrated.[6] *See Buboltz v. Birusingh*, 962 N.W.2d 747, 754–55 (Iowa 2021) ("Summary judgment is not a dress rehearsal or practice run for trial but rather the put up or shut up moment in a lawsuit, when a nonmoving party must show what evidence it has that would convince a trier of fact to accept its version of events." (cleaned up)). Instead, she argues the court "disregarded Plaintiffs' evidence from which a jury could have inferred that Amerigroup's explanations were pretextual." Even if that were the correct standard, which we doubt, Alexander offers nothing beyond speculation and conclusory statements that "Amerigroup tried to reduce its costs by pushing [child-in-need-of-assistance] proceedings on Alexander, and met [by] her resistance, retaliated by filing, or causing to be filed, false and retaliatory reports." *See Nelson*, 867 N.W.2d at 7 ("Speculation is not sufficient to generate a genuine issue of fact." (citation omitted)). Each of the reports was supported by contemporaneous medical

---

[6] We question the premise of this latter allegation, considering that each of the reporters for the other reports testified in their depositions that Amerigroup did not ask or encourage them to make those reports. But we accept it for the sake of argument.

records, as detailed in the background facts. While the reports were not confirmed, that does not mean they were false, as Alexander suggests on appeal. We agree with Amerigroup that such a conclusion would undermine the statute's purpose, which is "to encourage those who suspect child abuse to freely report it to authorities without fear of reprisal if their factual information proves to be faulty." *Id.* at 8 (citation omitted).

The district court did not err in finding that Amerigroup was entitled to qualified immunity under Iowa Code section 232.73(1). Amerigroup is accordingly shielded from liability for Alexander's claims for negligent and intentional infliction of emotional distress, which were based on the child abuse reports.[7] While Alexander argues on appeal that "Amerigroup's outrageous and injurious conduct extended well beyond making false abuse reports," the district court did not consider any other conduct in evaluating Alexander's claims, and she did not seek to enlarge its ruling. We accordingly find that argument was not preserved for our review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

### C.      Tortious Interference with the Parent-Child Relationship

Alexander's claim for tortious interference with the parent-child relationship alleged that Amerigroup "refused to approve medically necessary care for C.A. unless [she] agreed to relinquish custody of C.A. to the State of Iowa, which would then mean that her treatment was not paid for by Amerigroup."[8] The district court

---

[7] To the extent that Alexander's claim for negligent infliction of emotional distress was also based on Amerigroup's alleged breach of its contract with the department, that claim fails based on our rejection of Alexander's third-party beneficiary argument.

[8] Alexander also alleged that Amerigroup interfered with the parent-child relationship by "initiat[ing] false accusations that [she] had abused or neglected

granted Amerigroup summary judgment on this claim, reasoning that "Iowa law does not presently recognize a cause of action for tortious interference with the parent-child relationship."

Amerigroup concedes this was incorrect. *See Lennette v. State*, 975 N.W.2d 380, 390 (Iowa 2022) (collecting cases recognizing the tort). But it seeks to uphold the court's ruling on an alternate ground that it urged in its summary judgment motion. *See Tate v. Derifield*, 510 N.W.2d 885, 887 (Iowa 1994) ("On appeal we may affirm the district court ruling upon any ground raised in district court even if the ground is not one relied upon by the court."). That ground was Amerigroup's argument that Alexander "had no evidence" to establish the elements of the tort. We agree.

To establish a claim for intentional interference with the parent-child relationship, a plaintiff must show:

> (1) the plaintiff has a legal right to establish or maintain a parental or custodial relationship with his or her minor child; (2) the defendant took some action or affirmative effort to abduct the child or to compel or induce the child to leave the plaintiff's custody; (3) the abducting, compelling, or inducing was willful; and (4) the abducting, compelling, or inducing was done with notice or knowledge that the child had a parent whose rights were thereby invaded and who did not consent.

*Lennette*, 975 N.W.2d at 390 (citation omitted). There is no evidence that Amerigroup "took some action or affirmative effort to abduct the child or to compel or induce the child to leave the parent's custody." *Id.* We accordingly affirm the district court's grant of summary judgment on this claim.

---

C.A." But, as we concluded above, Iowa Code section 232.73(1) immunizes Amerigroup from liability on that ground.

### D. Declaratory Judgment

This leaves us with Alexander's claim for declaratory relief. Alexander's petition asked the court to declare that (1) "Amerigroup's pattern of retaliation . . . is illegal, a violation of Iowa law and against the public policy of the State of Iowa"; and (2) neither the contract nor Iowa law "authorizes Amerigroup to condition the approval of medically necessary health care on the relinquishment of custody of the child to the State of Iowa or the surrendering of any parental or guardianship rights."

The district court's ruling only addressed the first ground, finding that Alexander did "not ask the Court to declare that the alleged violations [of the contract] *would be* a violation, instead they ask the Court to declare that the alleged violations *do constitute* bad faith." The court granted summary judgment on that claim because "a request for declaratory judgment must be prospective." *See Livingood v. City of Des Moines*, 991 N.W.2d 733, 747 (Iowa 2023) ("Generally, a declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act." (cleaned up)).

Because the court did not address Alexander's prospective claim for relief, and she did not file a motion requesting a ruling, error has not been preserved for our review. *See Meier*, 641 N.W.2d at 537. And Alexander does not challenge the court's dismissal of the retrospective claim on appeal. As a result, we affirm the court's entry of summary judgment on Alexander's request for declaratory relief.

**IV.** **Conclusion**

After considering all of Alexander's arguments on appeal, whether specifically addressed or not, we conclude the district court correctly granted Amerigroup's motion for summary judgment and dismissed Alexander's petition.

**AFFIRMED.**